# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

C. O. MULLINS, ETC. v. LOUIS E. COLEMAN, ET AL.

April 8, 1940.

Record No. 2195.

Present, All the Justices.

The opinion states the case.

*Irby Turnbull,* for the appellant.

*V. C. Daniels* and *F. C. Bedinger,* for the appellees.

EGGLESTON, J., delivered the opinion of the court.

J. R. Coleman, a resident of Mecklenburg county, died during the latter part of July, 1938, leaving surviving his widow (his second wife) and seven adult children by his first wife. In August, 1938, a will of the deceased, executed on March 31, 1937, was admitted to probate in the clerk's office. By its terms only nominal sums, ranging from $1.00 to $25.00, were left to six children. All of the rest of the property was left to the widow for life and at her death to the testator's son, Herman H. Coleman, who had married Bessie Oakes, the daughter of the widow by a former marriage.

The executor named in the will having declined to qualify, C. O. Mullins, sheriff of the county, qualified as administrator, with the will annexed, of the estate of the decedent.

About six months after the will had been probated the testator's children, other than Herman H. Coleman, filed a bill in the court below attacking the validity of the will on the grounds that the testator lacked the necessary mental capacity to make a will, and that his signature thereto had been procured by fraud and undue influence of the widow and Herman H. Coleman, the two principal beneficiaries.

On an issue of *devisavit vel non* there was a verdict in favor of the contestants, on which the trial court entered a decree, hence this appeal by the contestees.

Although the bill contained no such allegation, at the trial the contestants claimed that the will, which was not in

the handwriting of the testator, had not been executed in the manner prescribed by Code, section 5229; that is, that the testator had not signed or acknowledged it in the presence of the two attesting witnesses, all present at the same time, and that the attesting witnesses had not signed in the presence of each other.

█ The basis of this contention was the admission of one of the attesting witnesses, prior to the trial, that he did not recall the circumstances as to the presence of the parties when the will was signed and witnessed. However, at the trial this witness testified that after having discussed the matter with the executor, who was likewise present, he was positive that the will had been signed and witnessed when all of the necessary parties were present together. This testimony is fully corroborated by that of the other attesting witness and the executor. Therefore, there is no basis for this contention.

█ We likewise find in the record no support for the contention that the testator lacked the necessary mental capacity at the time the will was executed. This contention is based upon the testimony of two physicians, Dr. A. T. Hart and Dr. J. W. Johnson, who had treated the testator for many years. They testified that during the latter part of his life the testator's blood pressure was high and that he had suffered a slight stroke of paralysis in the fall of 1935, and another in 1937. But both were equally positive that this condition did not affect his mind which was normal and sound. Dr. Hart stated that the testator's mind was "perfectly sound" up to two or three days before his death.

While Dr. Johnson had frequently treated Coleman for drinking, he was positive in his testimony that the testator's mind was not affected thereby and that his mental condition was normal except when he was under the influence of intoxicants.

Both of the attesting witnesses testified that the testator was of sound mind at the date of the execution of the will. Gordon, the only attesting witness who was questioned

on the subject, testified that he (Coleman) was perfectly sober at that time.

Five other witnesses testified as to the soundness of the mind of the testator on or about the date of the execution of the will. One of these was the draftsman of the will. Two were local men who had had business dealings with the testator, and one was the husband of one of the contestants.

This brings us to the principal question in the case, as to whether there was sufficient evidence to warrant the jury in finding that the testator's signature to the will was procured through the undue influence of either or both of the two principal beneficiaries, the widow and the testator's son, Herman H. Coleman.

No new principles of law are here involved. "Undue influence is a species of fraud. He who alleges it must prove it by clear and satisfactory evidence." *Redford* v. *Booker,* 166 Va. 561, 574, 185 S. E. 879, 885. It can not "be based upon bare suggestion, innuendo, or suspicion." *Core* v. *Core's Adm'rs,* 139 Va. 1, 14, 124 S. E. 453, 457.

Before undue influence can be made the ground for setting aside a will it must be sufficient to destroy free agency on the part of the person executing the instrument. It must be of such a character as to control the mind and direct the action of the testator. It must amount to coercion or duress. *Redford* v. *Booker, supra; Tabb* v. *Willis,* 155 Va. 836, 858, 156 S. E. 556; *Jenkins* v. *Trice,* 152 Va. 411, 429, 147 S. E. 251; *Jenkins* v. *Rhodes,* 106 Va. 564, 569, 56 S. E. 332.

Conceding the truth of all the testimony offered by the contestants, we think it falls far short of showing that either of the beneficiaries, the wife or the testator's son, Herman, fraudulently controlled or improperly influenced the testator in the disposition of his estate under this will.

The record here discloses the proof of not a single fact directly connecting either of the beneficiaries with the making or execution of the will. There is no evidence that

they undertook by entreaty, solicitation, importunity, or suggestion to persuade the testator to dispose of his property in their favor.

While proof of undue influence may rest entirely on circumstantial evidence (*Price's Ex'r* v. *Barham,* 147 Va. 478, 482, 137 S. E. 511), it should not be lightly inferred from circumstances which are capable of innocent construction (*Dearing* v. *Dearing,* 132 Va. 178, 189, 111 S. E. 286).

The contestants rely upon the following circumstances as proof of the wife's undue influence:

First, it is said that at the end of sixty days after the testator, a widower sixty years of age, had brought into his home, as a housekeeper, Mrs. Fannie Dora Oakes, a widow forty-one years of age, "she married him." There is nothing in the record to support the insinuation that the wife took the lead in the preliminaries which culminated in the marriage.

Nor do we find in the record any basis for the statement in contestants' brief that Mrs. Coleman "fastened" upon her son-in-law, Herman H. Coleman, "a matrimonial halter the exact duplicate of that worn by his father."

Next, it is said that shortly after the marriage the wife persuaded her husband to exchange his home and farm for a smaller place on the highway, which he renovated and refitted with new furniture, and that he purchased an automobile, the first he had ever owned. If proof that a recently acquired wife had persuaded her husband to purchase and furnish a new home were of evidential value to show that ten years later she unduly influenced him in the testamentary disposition of his estate, then few husbands indeed could be said to be free from undue influence. The same is true of the purchase of an automobile. It may be noted, too, in passing that there is not the slightest suggestion in the record that the exchange of properties was to the financial disadvantage of the husband.

Again, it is said that at the time of the marriage four sons and a married daughter were peaceably living with their father, and that eventually the stepmother drove all

of them except Herman, who married her daughter, from the home of the father and contrary to the latter's wishes.

The facts are that shortly before the father's second marriage in 1928, his daughter, Julia, was married and with her husband came to live on the place. Two of the Coleman sons, Peyton and Deries, were married in 1929 and likewise brought their wives to the father's place. As might be expected from this situation friction soon developed between the stepmother and her husband's children and their consorts. First, the daughter and her husband moved, and shortly thereafter the two sons and their wives left the father's place and established their separate homes.

It is argued that as the result of this ill will and bitterness, the stepmother poisoned the mind of the father towards his children and unduly influenced him to disinherit them in his will executed on March 31, 1937.

A complete answer to this argument is found, we think, in the fact that in a will written for the testator by a prominent local attorney in 1935, after the married children had left their father's place, and which the contestants admit was free of fraud and undue influence, two of the principal contestants, Peyton and Deries, were left nothing, because, as the will stated, of advances to them. And the daughter, Julia, who the contestants claim was driven from the home by the stepmother in the latter part of 1928, was one of the two residuary legatees and devisees under this will. It should be remembered, too, that this will remained in force until March, 1937, when the will here under attack was executed.

If the trouble which had arisen between the stepmother and the testator's children, prior to 1935, had no influence on the will written in that year, how can it be said that it influenced the will of 1937?

The same is true of the argument that Mrs. Coleman mistreated Louis, the youngest son, and made life so disagreeable for him that finally, in March, 1937, he left home and went to live with his eldest brother. Here we find that, notwithstanding the trouble between Louis and his step-

mother, which the contestants say existed from the time she came into the home until he left, this son was one of the two residuary legatees and devisees in the will of 1935, which remained in effect until 1937.

It seems to be the contention of the contestants that the destruction of the first will and the execution of the second were due to the undue influence of the wife. However, it is interesting to note that under both wills the provisions for the widow were practically the same. Except for certain small legacies and gifts, under both instruments she was given a life estate in the real and personal property of the testator. The principal difference in the two wills is that in the former, Julia, a married daughter of the testator, and Louis, the youngest son, were made the residuary legatees and devisees, while in the second will the son, Herman, is the residuary legatee and devisee. In the first will, as has already been stated, the two eldest sons, Peyton and Deries, were left nothing, while under the second each receives only $5.00. Each of the daughters, Selina and Elizabeth, was to receive $100 under the first will and is left $1.00 under the second. We thus see that even under the first will there was not an equal division of the property.

Moreover, the record clearly shows why the testator changed his will and made Herman the residuary legatee and devisee instead of Louis. In the early part of 1937 these brothers had a quarrel, in which the father took Herman's side. Angered at this Louis left and refused to return even upon his father's urgent solicitation.

We have the uncontradicted testimony of two neighbors, R. Eustace Thompson and L. W. Gordon, that in March, 1937, the testator told them, on separate occasions, that because of Louis's having left home he (the testator) was making a new will in which he was leaving all of his property to his son, Herman, who had remained faithful to him. Gordon was asked to act as executor but declined and suggested the name of C. P. Jones, who was so designated in the will.

Both of these witnesses testified that at that time the testator was mentally quite normal. There is other evidence to the same effect and none to the contrary.

It should be noted that sixteen months elapsed from the date of the execution of the will, on March 31, 1937, until the death of the testator on July 28, 1938. Therefore, he had ample time within which to reflect on the disposition he had made of his estate. All the while the will was in the custody of the draftsman and executor and none of the beneficiaries saw it.

■ Much stress is laid on the fact that during some of the bickerings between the testator's sons and daughters and their stepmother, and before the will was read to the members of the family, Mrs. Coleman stated that her husband had written a will in which all of his property had been left to her and to Herman. There is evidence that Herman made similar statements. It is argued that this shows that both of these beneficiaries knew the contents of the will before the death of the testator. But it by no means follows that such knowledge is evidence that the beneficiaries were guilty of the fraud charged against them and were responsible for the will. On the contrary, such knowledge is entirely consistent with their innocence, for it is, of course, quite possible that the testator may have told his wife and his favored son what disposition he had made of his property.

We find in the record no support for the argument in the brief that during the latter years of his life the testator was "a desperately ill man," whose mental and physical condition was "growing progressively worse." As has already been stated, the testator sometimes drank to excess, suffered from high blood pressure, and had a stroke of paralysis in 1935 and another in 1937. Yet the evidence is uncontradicted that his mental faculties were in no way impaired by these things. After each of the strokes he recovered physically and was able to proceed with his work on the farm up until a few days prior to his death.

There is no proof that the will of the testator was subject to that of his wife in his business affairs. The only direct testimony on the subject is that the testator was a man of strong mind and not easily influenced. This comes from his neighbors and those with whom he did business, all disinterested witnesses.

Upon the whole we are of opinion that the evidence on behalf of the contestants fails to show that the wife unduly influenced the testator to dispose of the property in the manner provided in the will.

While the bill charges that the son, Herman, was a party to the undue influence, there is not the slightest evidence to sustain the allegation. All of the evidence of the contestants is directed solely at the widow as the instigator of the plot to direct and control the testator's disposition of his estate.

For the reasons stated we think the verdict of the jury was contrary to the law and the evidence and should have been set aside. Accordingly the decree appealed from will be reversed and a final decree will be entered here dismissing the bill of complaint.

*Reversed.*