Richmond

## Patricia Wing Gill

v.

## John R. Gill, Et Al.

April 20, 1979.

Record No. 771386.

Present: All the Justices.

*Lawrence G. Cumming (Thomas R. Watkins; Kenneth G. Cumming; Cumming, Watkins, Chase & Williams, Ltd.*, on brief), for appellant.

*Mark P. Friedlander, Jr. (Mark P. Friedlander; Friedlander, Friedlander & Brooks*, on brief), for appellees.

POFF, J., delivered the opinion of the Court.

This appeal rises from a will contest based upon allegations of undue influence.

In 1957, four years after the death of his first wife, Dr. John Russell Gill, a medical practitioner (testator), married Patricia Wing Gill (the widow or Mrs. Gill). In 1972, he executed a formal will granting his widow a life estate in a trust and the marital residence, with remainder to his grandchildren. Testator died April 30, 1976 leaving a holographic will dated January 22, 1976 bequeathing five dollars to each of his two sons[1] by his first marriage and the residue of his estate in fee to his widow. Appealing from the order probating this instrument, testator's two sons and their six children,[2] infants acting by their fathers as next friends (collectively, the contestants), alleged that the instrument was the product of undue influence on the part of the widow. By final judgment order entered May 28, 1977, the trial court confirmed the jury's verdict that the instrument was not the testator's true last will and testament.

The dispositive issue posed by the widow's appeal is whether the evidence was sufficient to support a finding of undue influence. Addressing that issue, we summarize the evidence in the light most favorable to the contestants. *Lewis, Ex'r. v. Roberts*, 207 Va. 742, 744, 152 S.E.2d 44, 45 (1967).

The widow's marriage to testator, who was 14 years her senior, was her third; one prior marriage had ended in divorce and another in annulment. A conservative and frugal man, testator limited the funds available to his second wife to those necessary for basic expenses, a policy which led to some marital discord when she made what he considered extravagant purchases on credit. In support of their contention that the testator's temperament underwent a gradual change as his wife's dominance increased during the 19 years of their marriage, contestants find special significance in the following events disclosed by the evidence.

Upon completion of his younger son's education in 1961, testator suddenly diversified his investments by purchasing real estate in California; he also bought 100 shares of IBM stock, certificated jointly in his and his wife's names.

Three events occurred in 1972. Testator bought a second house located in Gloucester only 17 miles from his home; the deed was

---

[1] John R. Gill and Thomas D. Gill.

[2] Helen Dew Gill, Catherine Burns Gill, John Russell Gill, III, Thomas Gill, Jr., Meriwether Gill, and Mary Gordon Gill.

made jointly to him and his wife, and departing from his consistent custom, he financed the purchase with a mortgage. He opened a second medical office in Gloucester and, at the age of 68, substantially increased his working hours. He also executed the 1972 will naming his wife sole life tenant in the assets of his entire estate.

Testator strongly objected to the lifestyles followed by his wife's son and the young man's "boyfriend" and forbade them to enter his home. Yet, in 1974 Mrs. Gill induced him to withdraw the injunction. In a letter to a friend, she wrote that her son had exclaimed, "'Mother, you're a genius - you did it again.' He feels I've made a new person of John [testator]".

In 1975, when testator had begun to show signs of poor health, he provided his wife $40,000 to help capitalize a pillow shop she had opened. Later that year, after Mrs. Gill was defeated in a bid for election to the vestry of the church testator had attended since 1934, she moved her membership to another church and persuaded her husband to attend services there.

The remaining evidence upon which contestants rely to show undue influence concerns events which occurred during testator's terminal illness.

In January 1976, testator was examined by Dr. Alexander G. Brown, III, described at trial as a friend of Mrs. Gill. Dr. Brown scheduled a cancer operation for January 26. Mrs. Gill notified testator's sons by telephone but suggested that they need not be present. Both came, however, and finding their father "drawn, thin, weak looking", they remained until the operation was performed. Testator was discharged from the hospital on February 7 but, beginning February 26, returned weekly for chemotherapy. Testator resumed his medical practice on April 1 and, helped into his office chair by his wife, worked several hours a day before his death on April 30, 1976.

Following the operation, testator's sons, who had returned to their homes, tried to reach their father by telephone but were unable to do so. Late in February, they had planned to pay him another visit, but Mrs. Gill told them not to come because testator was too tired. The night before testator's death, she told one of his sons that testator had left no will and inquired about the details of administering an estate. On the day after testator's funeral she told testator's sister that he had made a will leaving everything to her.

Mrs. Gill testified that she visited testator in his hospital room between the hours of 10:00 a.m. and 3:00 p.m. on January 22, four days before his surgery; that testator told her to look in a bureau drawer while he walked down the hall; that when he returned he told her to take the paper writing she found there and put it in their safe-deposit box at the bank; and that she read the paper and did as she was told. Challenging the credibility of this testimony, contestants contend that the hospital records show that testator was undergoing medical attention during the time Mrs. Gill was there.

The holographic will was dated January 22, 1976. It was witnessed by Dr. Brown and James E. Markham, comptroller of the hospital Dr. Brown served as a corporate director. In a pre-trial deposition, Markham believed that he and Dr. Brown had witnessed the will some time in March while testator was undergoing chemotherapy. In his deposition, Dr. Brown said that the document was witnessed in February. Prior to trial, at the suggestion of the widow's counsel, Dr. Brown and Markham conferred and agreed that they had been mistaken as to the date and, at trial, both testified that they signed the document on January 22. Dr. Brown explained that he had left on vacation two days after testator's operation and had not seen him since that date.

As we understand contestants' theory of the case, they believe this evidence shows that, gradually over the course of her third marriage, Mrs. Gill became the dominant spouse, persuading her husband to change his fiscal policies, his religious affiliation, his work routine, his societal views, and his personal habits; that her influence increased as his health declined; that the holographic instrument was not witnessed the day it was dated as Dr. Brown and Markham testified; that, indeed, it was not even written until later at a time when testator was confined to his home, alone with his wife; and that testator wrote and pre-dated the instrument, at his wife's direction, to give the appearance it had been executed in anticipation of surgery.

Accepting the inference contestants urge, that testator's attitudes and practices changed and his wife's sway increased over the two decades they were married, we reject contestants' conclusion that the holographic will was the product of undue influence.

Not all influence is undue in the legal sense. *See generally* T. Atkinson, *Law of Wills* § 55, p. 256, *et seq.* (2d ed. 1953). "To be classed as 'undue', influence must place the testator in the attitude

of saying: 'It is not my will but I must do it.'" *Ginter v. Ginter*, 79 Kan. 721, 725, 101 P. 634, 636 (1909). To support a jury verdict of undue influence, the evidence must be "sufficient to show that the person executing the will was deprived of his volition to dispose of his property as he wished. There must be manifest irresistible coercion which controls and directs the testator's actions." *Wilroy v. Halbleib*, 214 Va. 442, 446, 201 S.E.2d 598, 601 (1974). Undue influence may be, and often must be, established solely by circumstantial evidence. *Culpepper v. Robie*, 155 Va. 64, 86, 154 S.E. 687, 695 (1930). But undue influence "should not be lightly inferred from circumstances which are capable of innocent construction." *Mullins v. Coleman*, 175 Va. 235, 240, 7 S.E.2d 877, 878 (1940). And "it cannot be based upon bare suggestion, innuendo, or suspicion." *Core v. Core's Adm'rs*, 139 Va. 1, 14, 124 S.E. 453, 457 (1924); quoted with approval, *Jenkins v. Trice*, 152 Va. 411, 429, 147 S.E. 251, 257 (1929). An *inference* of undue influence may be warranted where a testator was old when his will was executed, where he named a beneficiary who stood in a relationship of confidence or dependence, and where he had previously expressed an intention to make a different disposition of his property. *Culpepper v. Robie*. As we emphasized in *Culpepper*, however, such facts do not raise a presumption. "[T]hese are circumstances from which undue influence may be inferred, but are not alone sufficient to establish fraud, certainly not as between parent and child or husband and wife.'"[3] 155 Va. at 88, 154 S.E. at 696. "Fraud and undue influence are not to be presumed but must be proven by evidence clear, cogent and convincing." *Jenkins v. Trice*, 152 Va. at 429-30, 147 S.E. at 257. The ultimate burden of proof "is always upon him who alleges fraud." *Wallen v. Wallen*, 107 Va. 131, 150, 57 S.E. 596, 599 (1907); cited with approval, *Savage v. Nute*, 180 Va. 394, 404, 23 S.E.2d 133, 138 (1942).

█ The evidence adduced below fails the tests the law prescribes. We see no sinister significance in the events preceding testator's terminal illness. His investments in "blue chip" stocks and appreciating real estate, made after his sons had been

---

[3]Only such relationships as those of attorney and client, clergyman and parishioner, physician and patient, or close business associates are sufficient to give rise to a presumption. Moreover, by the majority rule the confidential relationship alone, unaccompanied by activity in procuring a will in favor of the attorney, clergyman, physician or business associate does not raise a presumption of undue influence (footnotes omitted).

Atkinson, *supra*, § 101, p. 550. *See also* Annot., 13 A.L.R.2d 381 (1967).

educated, prejudiced no one. True, he shared these new assets with his new wife, helped her finance her personal business venture, and executed a will naming her life tenant of his estate; but such conjugal behavior is hardly uncommon. His decision to allow his stepson to visit his home with a friend was doubtless influenced by his wife, as was his decision to follow her when she changed her church membership; but those decisions show little more than the high regard he held for her.

■ Nor do we find anything in the circumstances surrounding the execution of the will which rises above the level of "suggestion, innuendo, or suspicion." Contestants say that the hospital records prove that testator's medical examinations on January 22 left no time for the events described by Mrs. Gill; but the records before us show that, between the hours of 10:15 a.m. and 2:00 p.m. that day, the only examination conducted was an electrocardiogram. Even if, as contestants theorize, the will was not witnessed until February or March (a theory which presupposes perjury on the part of Dr. Brown and Markham), the one-page document could have been written, dated, and executed on January 22. And, since a holographic will need not be witnessed, a subsequent attestation is no more than a circumstance "capable of innocent construction."

■ We conclude that there is no evidence, other than that which lends itself to rank conjecture, that Mrs. Gill attempted to exert, or that testator was vulnerable to, the kind of invidious, coercive influence necessary to sustain the jury's verdict. There is no evidence whatever of senility, feeblemindedness, or other mental impairment; to the contrary, the record shows that, although physically weak, testator returned to the mental exactions of a part-time medical practice. Moreover, the will admitted to probate was written entirely in testator's own hand, a circumstance which tends to show a sedulous act of volition, deliberate and independent of external influence.

Applying the evidentiary standards we have defined, we hold as a matter of law that the evidence was insufficient to support a finding of undue influence. The judgment order will be reversed and final judgment affirming the order of probate will be entered here.

*Reversed and final judgment.*