## MARY ELLA WOOD WICKERS JARVIS

### V.

## NADIR TONKIN, ET AL.

Record No. 871309

June 9, 1989

Present: All the Justices

*William F. Burnside* for appellant.

*Joseph P. Massey (Vincent L. Parker; W. McMillan Powers; Cooper & Davis, P.C.*, on brief), for appellees.

Justice Russell delivered the opinion of the Court.

In this *devisavit vel non* case, a commissioner in chancery reported that the decedent's last will was entitled to probate. The chancellor disagreed, sustaining exceptions to the commissioner's report on the basis that the evidence showed that the will was

procured by undue influence exerted by the principal beneficiary. The correctness of that ruling is the sole question on appeal.

Ella Myers Wood died in Portsmouth in 1984 at the age of 89. She was the widow of the Reverend John W. Wood, who had died in 1978. No children were born of the marriage, but the Woods were survived by an adopted daughter, Mary Ella Wood Wickers Jarvis (Mary Ella), whom they adopted when she was about five years of age. In addition, the Woods had taken into their home two foster children, sisters who came from Brazil, Julie Pierce (Julie) and Nadir Tonkin (Nadir). Julie came to the Woods' home in 1961 and Nadir arrived in 1968. Julie and Nadir were never adopted. At the time of Mrs. Wood's death, Mary Ella had moved to Richmond. She later moved to Virginia Beach. Julie and Nadir lived in Portsmouth, not far from Mrs. Wood's home.

In 1971, the Woods executed similar reciprocal wills whereby each left all property to the survivor and the survivor left all property to Mary Ella. Soon after Mr. Wood's death in 1978, Mrs. Wood executed a second will which divided her property equally among Mary Ella, Julie, and Nadir. In 1981, Mrs. Wood executed a third will, the subject of this suit, which left $3,000 to each of the foster daughters and left the bulk of her estate to her adopted child, Mary Ella. The foster daughters contest the third will.

The evidence was in substantial conflict with respect to Mrs. Wood's relationships with her three beneficiaries, the frequency and nature of her contacts with them, and their treatment of her and attitudes toward her. In our view, however, the crucial evidence concerns the circumstances surrounding the execution of the 1981 will; accordingly, we focus upon that aspect of the case.

In 1981, Mrs. Wood was in poor physical health but was mentally competent. Indeed, the foster daughters concede her testamentary capacity, the commissioner in chancery so reported to the court, and the chancellor confirmed the report in that respect. As stated above, the sole issue is that of undue influence. In January 1981, Mary Ella became concerned that Mrs. Wood, who was living alone in Portsmouth, was in precarious physical condition and was not receiving adequate medical care. She was suffering from swollen ankles, weakness, and impaired breathing. Mary Ella drove Mrs. Wood to her home in Richmond and placed her in the care of Dr. John M. Daniel, III, a physician whose practice consisted largely of caring for elderly patients. Mary Ella had no

prior acquaintance with Dr. Daniel. Dr. Daniel treated Mrs. Wood on five successive office visits and prescribed medication for her. He testified, as did other witnesses, that her condition improved substantially during the period of this treatment.

Dr. Daniel reported that Mrs. Wood was suffering from congestive heart failure, that she was incapacitated, and that she required continuing supervision. As a result, Mary Ella, on application to the Circuit Court of Henrico County, was appointed guardian of Mrs. Wood's person and property in March 1981.

After revisiting her home in Portsmouth in April, Mrs. Wood returned to Mary Ella's Richmond home in May 1981. When Mrs. Wood expressed a desire to change her will, Mary Ella secured an appointment for her with Lee R. Gordon, a Richmond attorney with whom Mary Ella had no prior acquaintance. Mrs. Wood visited Mr. Gordon's office on two occasions — on the first visit to discuss with him her intended testamentary dispositions, and on the second visit to execute her new will. Mr. Gordon testified that he met Mary Ella when she brought Mrs. Wood to his office, but that he conferred with Mrs. Wood alone on both occasions. On both visits, Mary Ella remained in his waiting room, or left the office and returned later to pick up Mrs. Wood. He said, "She [Mary Ella] was out of the office. The door was shut." Mary Ella's testimony was to the same effect.

Mr. Gordon testified that Mrs. Wood brought the 1978 will with her, explained that she and her husband had intended to divide their estate equally among the three beneficiaries, but that she now "felt different from her husband and wanted to leave the majority of her estate to her daughter." He said that she was specific in stating her wishes, that she knew what she wanted, that her mind was clear, and that she did not appear to be "under the influence of any person." Nevertheless, because Mrs. Wood was changing an earlier disposition to favor one beneficiary over others, and because she was elderly, Mr. Gordon suggested that Mrs. Wood obtain a physician's statement. When she returned to execute the will on May 11, 1981, she brought with her a handwritten note from Dr. Daniel, dated the same day, which stated: "Ms. Ella Wood was seen in my office today & is aware of her circumstances. She understands she plans to change her will and give Mary Ella Wickers power of attorney." Mr. Gordon testified that when Mrs. Wood executed the will, it was "obvious that she was an adult of sound mind and knew what she was doing."

Mary Ella testified that her mother never told her what the new will provided, and that Mr. Gordon did not discuss it with her at the time. She said that when her mother emerged from Mr. Gordon's office after executing the new will, he handed it to her in a sealed envelope and Mrs. Wood asked her to keep it. Mary Ella also testified that when she was driving Mrs. Wood home, she asked Mrs. Wood what she wanted to do with the 1978 will. Mrs. Wood, who had the old will with her, said, " '[w]ell, I won't need this anymore,' " and "just tore it in a couple of pieces." Except for the testimony of Dr. Daniel concerning Mrs. Wood's physical and mental condition at the time, Mr. Gordon and Mary Ella were the only witnesses to the circumstances surrounding the execution of the 1981 will.

Mrs. Wood returned to Portsmouth in 1981 and remained there until her death in 1984. After her death, Mary Ella offered the 1981 will for probate in the Circuit Court of Henrico County, but that court ruled that probate was not proper in Henrico County. Julie and Nadir then instituted this proceeding by bill of complaint filed in Portsmouth, seeking to establish a copy of the 1978 will as Mrs. Wood's true last will, the original of which "has been lost or destroyed by accident or design." Mary Ella filed a cross-bill seeking admission of the 1981 will to probate.

The court referred the case to a commissioner in chancery who heard the testimony of numerous witnesses, read depositions, and examined the exhibits. The commissioner reported to the court that although some of Mary Ella's actions might have been a source of suspicion, Julie and Nadir had failed to carry their burden of proving fraud or undue influence, that Mrs. Wood had the requisite testamentary capacity in 1981, that she had effectively revoked her 1978 will, and that the 1981 will was her valid last will and testament.

Julie and Nadir filed exceptions to the commissioner's report, asserting that the evidence was sufficient to show that the 1981 will had been procured by undue influence and that the 1978 will had not been validly revoked. The chancellor considered the briefs and arguments of counsel, sustained the exceptions, and ruled that the 1981 will had been procured by undue influence. The chancellor also made an express finding that Mary Ella had "fraudulently destroyed" the 1978 will "in the lifetime of the testatrix." The court entered a final decree in August 1987, establishing the copy

of the 1978 will as Mrs. Wood's true last will and revoking probate of the 1981 will. We granted Mary Ella an appeal.

"Undue influence . . . is a species of fraud." *Thornton* v. *Thornton's Ex'rs*, 141 Va. 232, 240, 126 S.E. 69, 71 (1925). "[I]t cannot be based upon bare suggestion, innuendo, or suspicion." *Core* v. *Core's Adm'rs*, 139 Va. 1, 14, 124 S.E. 453, 457 (1924). Before a will may be set aside on the ground of undue influence, that influence "must be sufficient to destroy free agency on the part of the . . . testator." *Wood* v. *Wood*, 109 Va. 470, 472, 63 S.E. 994, 995 (1909). It must be of such character as to control the testator's mind and actions. *It must amount to coercion or duress. Mullins* v. *Coleman*, 175 Va. 235, 239, 7 S.E.2d 877, 878 (1940). A party seeking to raise a presumption of undue influence is required to establish each prerequisite element by clear and convincing evidence. *Martin* v. *Phillips*, 235 Va. 523, 528-29, 369 S.E.2d 397, 400 (1988).

A presumption of undue influence may arise in the case of a will where the contestant proves by clear and convincing evidence that "(1) the testator was enfeebled in mind when the will was executed, (2) the requisite confidential or fiduciary relationship was accompanied by activity in procuring or preparing the favorable will, and (3) the testator previously had expressed a contrary intention to dispose of his property." *Id.* at 528, 369 S.E.2d at 400. In *Martin*, we narrowed the sweeping language of such earlier cases as *Culpepper* v. *Robie*, 155 Va. 64, 88, 154 S.E. 687, 696 (1930), where the first prerequisite element of the presumption was said to exist when the testator was merely "old" when his will was executed. We noted that our cases had given rise to the presumption only when the testator was shown to have been suffering from "physical feebleness or mental weakness" arising from age, infirmity, or other cause. *Martin*, 235 Va. at 527, 369 S.E.2d at 399 (quoting *Redford* v. *Booker*, 166 Va. 561, 575, 185 S.E. 879, 885 (1936)). We concluded that the presumption did not apply unless the testator was "enfeebled in mind" when executing the will. *Martin* at 528, 369 S.E.2d at 400.

In the present case, the record is devoid of evidence that Mrs. Wood was "enfeebled in mind" when she executed the 1981 will. The evidence was strongly to the contrary.

The second prerequisite element requires the existence of a "confidential or fiduciary relationship." *Id.* Such a relationship might arise in the present case from the formal appointment of

Mary Ella as Mrs. Wood's guardian, *see Waddy v. Grimes*, 154 Va. 615, 647-49, 153 S.E. 807, 817 (1930), or from the less formal relationship of parent and child, *see Hartman v. Strickler and Wife*, 82 Va. 225, 237-38 (1886). Nevertheless, such a "confidential or fiduciary relationship" in the abstract is an insufficient predicate for the creation of a presumption of undue influence. To constitute the second element of the presumption, "the relationship must be accompanied by activity on the part of the dominant person *in procuring or preparing the will.*" *Martin*, 235 Va. at 528, 369 S.E.2d at 400 (emphasis added).

In the present case, the only evidence concerning the procuring or preparing of the will was that Mrs. Wood dealt independently with her attorney, that Mary Ella was absent when the will was discussed, formulated, and executed, and that, far from dictating its contents, she had no knowledge of her mother's testamentary intentions.

■ The chancellor, in evident disagreement with the conclusion drawn from the evidence by the commissioner in chancery, also made a finding that the 1978 will was "fraudulently destroyed by [Mary Ella] in the lifetime of the said testatrix." As noted above, the only evidence on this point was Mary Ella's own testimony which was directly to the contrary. Her testimony was unimpeached, uncontradicted, and not inherently incredible. The chancellor was not at liberty to disregard it.

■ We have repeatedly held that although a trier of fact must determine the weight of the testimony and the credibility of witnesses, it may not arbitrarily disregard uncontradicted evidence of unimpeached witnesses which is not inherently incredible and not inconsistent with facts in the record, even though such witnesses are interested in the outcome of the case. *Bradner v. Mitchell*, 234 Va. 483, 487 n.2, 362 S.E.2d 718, 720 n.2 (1987); *Cheatham v. Gregory*, 227 Va. 1, 4, 313 S.E.2d 368, 370 (1984).

■ We recently restated the principles governing our review of a chancellor's decree which has set aside a commissioner's report.

> While the report of a commissioner in chancery does not carry the weight of a jury's verdict, Code § 8.01-610, *it should be sustained unless the trial court concludes that the commissioner's findings are not supported by the evidence.* This rule applies with particular force to a commissioner's findings of fact based upon evidence taken in his presence

. . . . [W]here the chancellor has disapproved the commissioner's findings, this Court must review the evidence and ascertain whether, under a correct application of the law, the evidence supports the findings of the commissioner or the conclusions of the trial court. Even where the commissioner's findings of fact have been disapproved, an appellate court must give due regard to the commissioner's ability, not shared by the chancellor, to see, hear, and evaluate the witnesses at first hand.

*Morris* v. *United Virginia Bank*, 237 Va. 331, 337-38, 377 S.E.2d 611, 614 (1989) (citations omitted) (emphasis added) (quoting *Hill* v. *Hill*, 227 Va. 569, 576-77, 318 S.E.2d 292, 296-97 (1984)); *accord Sprott* v. *Sprott*, 233 Va. 238, 240, 355 S.E.2d 881, 882 (1987).

Because the commissioner's report was supported by the evidence, the chancellor erred in setting it aside. Accordingly, we will reverse the decree and enter final judgment here, holding the 1981 will to be the true last will and testament of Ella Myers Wood and ordering it admitted to probate in the court below.

*Reversed and final judgment.*