## CIRCUIT COURT OF FAIRFAX COUNTY

Carol Beek,
Rosemary Pilkerton,
and Joyce Speakman

v.

Bonnie June Speakman

November 21, 2000

Case No. (Chancery) 162732

BY JUDGE MICHAEL P. MCWEENY

This case requires the Court to determine the validity of a Deed of Gift, a Will, and a Power of Attorney. The questions before the Court are whether Mrs. Hazel Speakman had the requisite capacity when she executed the documents; and whether the documents were the product of undue influence.

### Factual and Procedural Background

Mrs. Speakman executed the challenged documents on May 22, 1997. At that time, Mrs. Speakman exhibited signs of dementia. Taken together, these documents substantially disinherited three of Mrs. Speakman's four daughters. This disposition did not comport with a Will Mrs. Speakman executed in 1986, which directed that Mrs. Speakman's four daughters share her estate equally. Mrs. Speakman died on August 30, 1998, and the 1997 Will was admitted to probate. This challenge to the validity of the 1997 Will, the Deed of Gift, and the Power of Attorney followed.

In their Bill of Complaint, Carol Beek, Rosemary Pilkerton, and Joyce Speakman (collectively "the sisters") allege that the documents are invalid. The challenge to the documents' validity rests on two premises. First, the

sisters contend that Mrs. Speakman lacked legal capacity at the time of their execution. Second, the sisters allege that the documents are the product of undue influence exerted by the Respondent, Bonnie June Speakman (hereinafter Bonnie).

After a four day trial, in which the Court heard testimony *ore tenus* on September 18, 19, 20, and 21, 2000, the Court asked the parties to submit written closing arguments. During the trial, the Court heard extensive testimony, which was in considerable conflict, regarding Mrs. Speakman's mental status during her final years of life, as well as the relationship between Bonnie and the sisters. The Court reviewed counsel's written arguments, the evidence and testimony presented at trial, and the controlling authorities. For the reasons set forth below, the Court concludes that Mrs. Speakman had the requisite capacity to execute the documents and that they were not the products of undue influence.

*Capacity*

The Court finds that Mrs. Speakman had testamentary capacity, which was proved by a preponderance of the evidence. "The proponent of the will bears the burden of proving the existence of testamentary capacity by a preponderance of evidence and retains that burden throughout the proceeding." *Gibbs v. Gibbs*, 239 Va. 197, 199, 387 S.E.2d 499 (1990). Both sides presented significant evidence regarding Mrs. Speakman's capacity to execute the documents. The evidence was in sharp conflict and revolved largely around the issue of how far Mrs. Speakman's dementia had progressed by May 1997.

The Court has no doubt that Mrs. Speakman suffered from dementia. There also was testimony regarding signs of Alzheimer's disease as early as 1996. This diagnosis was confirmed by the autopsy. The finding of dementia, however, or even Alzheimer's is not dispositive. "Neither sickness nor impaired intellect is sufficient, standing alone, to render a will invalid. If at the time of its execution the testatrix was capable of recollecting her property, the natural objects of her bounty and their claims upon her, knew the business about which she was engaged and how she wished to dispose of her property, that is sufficient." *Tabb v. Willis*, 155 Va. 836, 859, 156 S.E. 556 (1931). Thus, we reach the crux of the issue.

Dr. Joan Barber, an expert in the field of geriatric psychiatry, testified on behalf of the sisters. Dr. Barber based her testimony on the post mortem and a review of Mrs. Speakman's voluminous medical records. Although the Court does not doubt Dr. Barber's medical expertise, the fact remains that Dr. Barber never had the opportunity to personally observe Mrs. Speakman.

Accordingly, her conclusions regarding Mrs. Speakman's capacity at the relevant time are not (nor can they be) conclusive. Indeed, Dr. Barber's actual testimony was that it was "highly unlikely" that Mrs. Speakman had the requisite capacity on May 22, 1997. But "highly unlikely," based only upon statistical models of how Alzheimer's progresses, rather than personal observation is simply not sufficient given the other evidence before the Court.

"The time of execution of the will ... is the critical time for determining testamentary capacity. The testimony of witnesses as to the mental capacity of the testatrix *at this time* carries great weight." *Pace v. Richmond*, 231 Va. 216, 219, 343 S.E.2d 59 (1986) (internal citations omitted) (emphasis added); see also *Tate v. Chumbley*, 190 Va. 480, 495, 57 S.E.2d 151 (1950) (The testator's "mental status ... at the time he makes and executes the will is the controlling factor."). Mr. John Melnick, the attorney who prepared the documents now under attack, testified as to the circumstances of the documents' execution. Mr. Melnick is a respected member of the Bar who has considerable experience with estate-planning work for older clients. Although Mr. Melnick found Mrs. Speakman to be "sharp as a tack," a will contest was foreseeable given the disposition of the estate's assets. For this reason, and also because of Mrs. Speakman's age, Mr. Melnick advised Mrs. Speakman to have her treating physician affirm her capacity to execute the documents.

Mrs. Speakman did exactly as she was advised. On May 6, 1997, Dr. Peter Cook saw Mrs. Speakman and assessed her capacity to execute the documents. Dr. Cook wrote a letter on May 12, 1997, stating unequivocally that in his medical opinion, Mrs. Speakman was able to execute legal documents at that time. Dr. Cook did not testify at trial; however, in addition to his letter, his notes from the visit were introduced into evidence. Dr. Cook noted that Mrs. Speakman suffered from "mild dementia"; but that his opinion was that she was "competent to choose daughter as Power of Attorney." A record from a prior visit notes that on April 7, 1997, Mrs. Speakman was "alert and oriented except as to the day." As late as February 17, 1998, the medical records reveal that the health care provider found Mrs. Speakman "oriented to person and place."

Mr. Melnick testified at considerable length regarding his meetings with Mrs. Speakman. Mr. Melnick stated that Mrs. Speakman was concerned that Bonnie would not have a place to live after Mrs. Speakman's death. Because Mrs. Speakman considered the sisters to be well provided for, she wished to change her earlier will. Mrs. Speakman had a rational reason for seeking to change her will. She was concerned, as most mothers undoubtedly would be, about Bonnie's future. Mr. Melnick concluded, from his conversations with Mrs. Speakman, that she understood what property she had and how she

wanted to distribute her property. According to Mr. Melnick, Mrs. Speakman was also aware that the sisters would be unhappy with the disposition she was making. In other words, Mr. Melnick's testimony meets the four criteria necessary for finding capacity.

Furthermore, Mr. Melnick's testimony is supported by other testimony indicating that Mrs. Speakman was concerned about Bonnie's special needs in contrast to her other three daughters, whom Mrs. Speakman considered financially secure. According to the testimony of Clare Tisser, Mrs. Speakman expressed concern for Bonnie's future as early as 1996. Mrs. Tisser testified that she encouraged Mrs. Speakman to meet with an attorney to change her will and address her concerns for Bonnie. The evidence shows that Mrs. Speakman had a clear and rational reason for the disposition she made.

In sum, those who were able to observe Mrs. Speakman at the time of execution found her competent and the medical records support those conclusions. "The preservation of the privilege of making one's own will brings to the old and helpless a consideration which might not otherwise always be extended to them, and should not be whittled away." *Tabb*, 155 Va. at 862. In view of the above, the Court finds that on May 22, 1997, Mrs. Speakman had the capacity to understand the nature of her property, she knew who the "natural objects of her bounty" were, and that she knew how she wished to dispose of her property. The evidence also shows, and the Court finds, that Mrs. Speakman knew that she was executing a will, a deed of gift, and a power of attorney. Thus, the Court holds that Mrs. Speakman had the requisite capacity to execute the documents.

### Undue Influence

A finding of capacity in this case is not the end of the inquiry. The bill of complaint also alleges that Bonnie exerted undue influence on Mrs. Speakman to procure the documents. It is to this question that the Court now turns.

As an initial matter, the Court notes that the burden of proof on this issue is materially different from the burden on the issue of capacity. "The burden of showing undue influence rests upon those who allege it, and it cannot be based upon bare suggestion, innuendo, or suspicion." *Pace v. Richmond*, 231 Va. 216, 224, 343 S.E.2d 59 (1986); see also *Jarvis v. Tonkin*, 238 Va. 115, 120, 380 S.E.2d 900 (1989). Rather, it "must be proven by evidence clear, cogent, and convincing." *Gill v. Gill*, 219 Va. 1101, 1106, 254 S.E.2d 122 (1979) (internal citation omitted). Thus, on this question, the burden of proof

rests on the sisters to demonstrate undue influence by clear and convincing evidence.

The Court heard extensive evidence regarding the relationship between both Bonnie and Mrs. Speakman and Bonnie and the sisters. As with the testimony and evidence regarding Mrs. Speakman's capacity to execute the documents, the evidence was in sharp conflict regarding the influence Bonnie may or may not have had over Mrs. Speakman. In weighing this evidence, the Court is cognizant of the established standards for undue influence.

> Before undue influence can be made the ground for setting aside a deed, it must be sufficient to destroy free agency on the part of the grantor; it must amount to coercion — practically duress. Suggestion and advice, addressed to the understanding and judgment, do not constitute undue influence, nor do solicitations, unless the party be so worn by the importunities that his will gives way. Earnest entreaty, importunity, and persuasion may be employed, but if the influence is not irresistible it is not undue, and its existence is immaterial, even though it is yielded to.

*Tabb*, 155 Va. at 858. Similarly, "where the provisions of the will accord with the affections and previous declarations of the testator, and are such as might have been justly expected, that is persuasive evidence both of testamentary capacity and freedom of action." *Hartman v. Strickler*, 82 Va. 225, 237 (1886). In other words, "not all influence is undue in the legal sense." *Gill*, 219 Va. at 1105.

At trial, the sisters made much of the fact that Mrs. Speakman was in Bonnie's care during the final years of her life. They also claimed that Bonnie made concerted efforts to isolate Mrs. Speakman from the other family members. In urging their desired result on the Court, the sisters assert that there is a presumption of undue influence in cases such as the one at bar.

> To raise a presumption of undue influence in the execution of a will, the evidence must show that (1) the testator was enfeebled in mind when the will was executed, (2) the requisite confidential or fiduciary relationship was accompanied by activity in procuring or preparing the favorable will, and (3) the testator previously had expressed a contrary intention to dispose of his property. Similarly, to raise a presumption of undue influence in the execution of a deed or lease, the evidence must show that (1) the grantor (lessor) had great weakness of mind when the document was executed, (2) the grantee (lessee) stood in a confidential or fiduciary relationship to the grantor

(lessor), either in a formal relationship, or in a less formal relationship involving matters of a business nature, and (3) the consideration was grossly inadequate or the transaction occurred amidst "circumstances of suspicion." To raise a presumption of undue influence, each element must be established by clear and convincing evidence.

*Martin v. Phillips*, 235 Va. 523, 528, 369 S.E.2d 397 (1988) (quoting *Fishburne v. Ferguson's Heirs*, 84 Va. 87, 111, 4 S.E. 575 (1887)). Because the standard is essentially the same for both deeds and wills, the Court will treat each element of the presumption in turn, evaluating the evidence presented through the prism of the heightened standard of proof the sisters must satisfy.

On the first prong of the presumption, the Court finds as a fact that Mrs. Speakman suffered from dementia and Alzheimer's disease. These matters were established by clear and convincing evidence. The sisters also testified that Mrs. Speakman was easily persuaded, and Bonnie conceded this point. There is credible evidence in the record, however, that Mrs. Speakman was not so disabled that she did not know what went on around her. To the contrary, the evidence shows that Mrs. Speakman was acutely aware of the family dynamic among the four daughters. The evidence also shows the Mrs. Speakman knew precisely what she was doing when she executed the documents and had a rational reason for doing so. Accordingly, the sisters cannot show that Mrs. Speakman was legally "enfeebled in mind" by clear and convincing evidence.

Next, to successfully raise the presumption of undue influence, the sisters must show that a fiduciary or confidential relationship existed between Bonnie and Mrs. Speakman. A fiduciary or confidential "relationship might arise ... from the less formal relationship of parent and child." See *Hartman v. Strickler*, 82 Va. 225, 237-38 (1886). The evidence shows, and Bonnie does not deny, that she was Mrs. Speakman's caregiver during Mrs. Speakman's final years. Bonnie's role as caregiver, coupled with the familial relationship is sufficient to give rise to a fiduciary relationship. "Nevertheless, such a 'confidential or fiduciary relationship' in the abstract is an insufficient predicate for the creation of a presumption of undue influence. To constitute the second element of the presumption, 'the relationship must be accompanied by activity on the part of the dominant person *in procuring or preparing the will*." *Jarvis v. Tonkin*, 238 Va. 115, 121, 380 S.E.2d 900 (1989) (quoting *Martin*, 235 Va. 523, 528, 369 S.E.2d 397 (1988)) (emphasis original).

Here, the evidence shows that although Bonnie drove Mrs. Speakman to both the appointments with Mr. Melnick and the appointment with Dr. Cook, this evidence is not sufficient to support a finding that Bonnie acted to procure or prepare the documents. To the contrary, the evidence demonstrates that Bonnie drove her mother to all her appointments, whether social or business. In addition, Mr. Melnick testified that Bonnie waited in the reception area while he and Mrs. Speakman met. Bonnie did not participate in any of the meetings that led to the drafting and execution of the documents. The evidence also shows that Mrs. Speakman knew what she was executing. This simply is not a case where Bonnie had the documents prepared without Mrs. Speakman's knowledge or participation. Nor is this a case where Mrs. Speakman was presented with documents that purported to be something other than what they were to get her signature. Given the available evidence, the sisters have failed to prove that Bonnie procured or prepared the documents.

Turning to the third prong of the presumption, the appropriate test is slightly different depending on whether the contest is to a will or a deed. As this case requires a determination of both, the Court will treat each issue separately. The presumption of undue influence in procuring a will arises when the testator has previously expressed a contrary intention to dispose of his property. See *Martin*, 235 Va. at 528. Here, the sisters argue that the 1986 Will is the "previously expressed intention" and that the documents lead to a result contrary to that intention. The only material difference between the two proposed dispositions is the treatment of the house. Under the 1986 will, the four daughters were to equally divide the estate. Testimony on behalf of the sisters' position came from several witnesses, including Joyce Speakman and Mrs. Evelyn Berrigan, a long-time friend of Mrs. Speakman. Joyce testified that in 1995, Mrs. Speakman told Joyce that she wanted "the house and everything I own is going to you four girls." Mrs. Berrigan stated that Mrs. Speakman told her that the four daughters were to share the estate equally.

Technically, the Will itself still accomplished the goal Mrs. Speakman expressed to Mrs. Berrigan; the four sisters share the estate equally. It was the Deed of Gift that changed the composition of the estate. The Deed of Gift that Mrs. Speakman executed on May 22, 1997, created a joint tenancy in Mrs. Speakman and Bonnie, with the common law right of survivorship. Thus, the house was removed from Mrs. Speakman's estate. Notwithstanding the discrepancy between this change in ownership and the desire to have the sisters share the estate equally, there also was testimony that Mrs. Speakman worried about where Bonnie would live after her death. This concern was apparently longstanding and Mrs. Speakman confided her concern to her friend Mrs. Clare Tissier. Mrs. Tissier stated that Mrs. Speakman voiced

concern for Bonnie's future as early as 1993 and that, in April 1997, Mrs. Tissier encouraged her to speak with an attorney. In light of this conflicting testimony, the Court cannot find by clear and convincing evidence that the disposition was contrary to a previously expressed intention.

A deed is presumed to be the product of undue influence when, given the presence of the other factors, the consideration is "grossly inadequate" or there are other "circumstances of suspicion." *Id.* But "mere failure of consideration or want of consideration will not ordinarily invalidate an executed contract. A property owner ... can give it away, and he can sell it for a peppercorn." *Planters Nat. Bank v. E. G. Heflin Co.*, 166 Va. 166, 173, 184 S.E. 216 (1936). Although the Court finds it difficult to conceive a situation where there would be "grossly inadequate consideration" among family members, the Court also notes that Bonnie provided care and services to Mrs. Speakman. Cognizant of the holding in *Fishburne*, the Court finds this case distinguishable because Bonnie was a family member rather than a stranger. Gifts of property among family members are common and do not give rise to a presumption of undue influence.

The linchpin of the sisters' argument for a finding of undue influence lies in what the sisters argue are "other circumstances of suspicion." These "circumstances" include claims that Bonnie isolated her mother from the sisters and that Bonnie abused her mother. During the trial, the sisters all placed heavy emphasis on their claim that Bonnie went to pains to restrict their access to Mrs. Speakman. The sisters testified that Bonnie intercepted correspondence and telephone calls, that she listened in on telephone calls, and that she refused the sisters access to the house, and that Bonnie played upon her mother's fear of nursing homes in an attempt to manipulate Mrs. Speakman. While the Court is in no doubt that there is some element of truth in this testimony, the Court also notes the sisters' unrelenting tendency to find an evil intent in all of Bonnie's actions and to ascribe fault to Bonnie which clearly lays elsewhere. For example, Joyce testified that Bonnie intercepted her correspondence to Mrs. Speakman. The letter offered into evidence clearly belies this testimony, however, as the letter itself contains a notation from Carol Beek saying that she was sorry and it was her fault the letter had been delayed.

Similarly, the Court is unpersuaded by the allegation that Bonnie kept her mother from the other members of the family. Although there was evidence that Bonnie did not allow the sisters into the house, the Court does not find this evidence dispositive on the issue of isolation. First, the evidence clearly shows that Bonnie brought Mrs. Speakman to family events, and, therefore, it cannot properly be argued that Bonnie was isolating Mrs. Speakman from the sisters. Second, the sisters' hostility toward Bonnie was palpable to the Court.

Given the level and intensity of the animosity, the Court does not find Bonnie's reluctance to allow the sisters unrestricted access to her home "suspicious."

The sisters also argued that Bonnie attempted to manipulate her mother by playing on Mrs. Speakman's fear of nursing homes. Rosemary Pilkerton testified that Bonnie would say on the telephone, apropos of nothing, "No, I'm not going to put Mom in a nursing home." The Court finds this testimony compelling evidence of an attempt to manipulate Mrs. Speakman's decisions. Clearly, this was an effort to hold the possibility of going to a nursing home to influence Mrs. Speakman. Nevertheless, "earnest entreaty, importunity, and persuasion may be employed, but, if the influence is not irresistible, it is not undue, and its existence is immaterial, even though it is yielded to." *Tabb*, 155 Va. at 858. There is not clear and convincing evidence before the Court that this attempt at manipulation was "irresistible" or amounted to duress. Indeed, the evidence shows that Mrs. Speakman was aware of another option. Carol testified that she had offered to have Mrs. Speakman live with her. Mrs. Speakman refused, preferring to live in her own home with Bonnie.

Finally, the sisters attempted to show that Bonnie had abused Mrs. Speakman and that this abuse led Mrs. Speakman to execute the documents to appease Bonnie. In support of this argument, the sisters introduced evidence that Bonnie hit Mrs. Speakman in 1995. Carol, Rosemary, and Joyce all testified that their mother was afraid of Bonnie. Bonnie admitted hitting her mother and kicking her once in 1995; however, the evidence also shows that Bonnie voluntarily checked in to a mental health facility for treatment immediately following (and because of) this incident. Bonnie testified that there was never a repeat of the 1995 incident. Moreover, that single incident is too remote in time to form the basis of a finding of undue influence.

Because the sisters cannot prove any of the three required elements for a presumption of undue influence by clear and convincing evidence, the Court must find in favor of validity. Accordingly, the Court holds that there was no undue influence in this case.