HAMILTON W. PACE, ET AL.

V.

JOSEPH W. RICHMOND, ET AL.

Record No. 821749

April 25, 1986

Present: All the Justices

C. *Waverly Parker (Robert L. Bushnell*, on brief), for appellants.

*Matthew B. Murray* for appellee, Joseph Richmond.

No briefs or arguments for appellees, Lyle W. Ingalls, Ann M. Ingalls, Cheryl Breeden, Dorothy P. Yager, Clyde Yager, Hugh C. Yager (the younger), Mary Louise Gentry and Alma Wade.

POFF, J., delivered the opinion of the Court.

This appeal arises out of a contest between the beneficiaries of two formal wills executed by Robert Lee Pace (hereinafter, Mr. Pace or the testator). Mr. Pace died without issue at the age of 81 on May 20, 1981. His estate was valued at more than $190,000.

By will dated April 5, 1968, he named two nephews, Hamilton and Montie Pace (hereinafter, the nephews), as sole beneficiaries of his estate. In a second will dated January 4, 1979, Mr. Pace provided: "I make no bequest whatsoever to my nephews, Hamilton W. Pace and Montie R. Pace, who are able to look after themselves and who have paid little or no attention to me during the last ten years." By that will, he devised a house and lot in Charlottesville to Hugh C. Yager who resided there as the testator's tenant. The rest and residue of his property he left to Lyle W. Ingalls and his wife, Ann M. Ingalls. The Ingallses and Joseph W. Richmond, an attorney, were named co-executors.

At trial, the nephews attacked the second will on the grounds that the testator lacked testamentary capacity and that he was the victim of undue influence.* The chancellor sustained a motion to strike their evidence and entered a final decree admitting the second will to probate. Appealing from that decree, the nephews renew the attacks they made at trial and challenge an evidentiary ruling.

The evidence showed that the testator and his wife lived alone for many years on a secluded mountain farm called Glenhaven. His wife died in 1968, and Mr. Pace decided to move. Paying a price in excess of its appraised value, Hamilton bought the farm, and Mr. Pace engaged his nephew to build a new house near Hamilton's home in Stony Point. The house contained two apartments, and Mr. Pace moved into the lower unit in May 1972. Later that year, the Ingallses, residents of Florida, moved into the upper apartment where they lived until Mr. Pace died nine years later.

The proponents of the January 4, 1979 will introduced a number of witnesses who saw the testator on the day it was executed. Dr. Bruce Carter, an ophthalmologist, had seen Mr. Pace a week earlier. Mr. Pace had awakened to find himself blind in one eye. Dr. Carter testified that his patient "was obviously upset about the loss of vision" but that he "found him to be an extremely alert person". He described the testator's mental condition when he saw him again on the date he signed his will as "oriented, clear, concerned."

Richmond, Mr. Pace's attorney, drafted the two wills offered for probate and had represented the testator in other legal matters. Mr. Pace came to his office on January 3, 1979 and told him that he wanted to make a new will because "he was very deeply upset and distressed about . . . the treatment that he had received from his two nephews". Richmond prepared the will and Mr. Pace executed it in his office the next day. He said that his client was "alert and oriented", "his physical vitality was remarkable", and "he knew what his kin folk were." Responding to Richmond's inquiry, Mr. Pace identified the houses in Charlottesville and Stony

---

* Yager died testate following Mr. Pace's death, and the beneficiaries of his will, Dorothy P. Yager, Hugh C. Yager, Jr., Clyde W. Yager, and Cheryl Dale Breeden, were joined as parties in the court below. Mary Louise Gentry and Alma Wade, two of Mr. Pace's heirs at law, were also added as necessary parties.

Point and told the attorney that "he had seventy-five or a hundred thousand dollars in the bank."

James B. Murray, Jr., an attorney in Richmond's firm, subscribed the will as an attesting witness. Murray noticed nothing unusual in Mr. Pace's mental condition. Yvonne C. Ward, Richmond's secretary, also witnessed the will. She observed no "deficiencies in his mental powers" and characterized his condition as "alert and the way he always was."

"[T]he time of execution of the will . . . is the critical time for determining testamentary capacity. The testimony of witnesses as to the mental capacity of the testatrix at this time carries great weight." *Thomason* v. *Carlton*, 221 Va. 845, 853, 276 S.E.2d 171, 175 (1981). In *Tate* v. *Chumbley*, 190 Va. 480, 57 S.E.2d 151 (1950), the testatrix made her will while on furlough from a mental institution. Upholding probate, we said:

> "Neither sickness nor impaired intellect is sufficient, standing alone, to render a will invalid. If at the time of its execution the testatrix was capable of recollecting her property, the natural objects of her bounty and their claims upon her, knew the business about which she was engaged and how she wished to dispose of her property, that is sufficient."

*Id.* at 495, 57 S.E.2d at 158 (quoting *Gilmer* v. *Brown*, 186 Va. 630, 639, 44 S.E.2d 16, 20 (1947)).

The evidence of testamentary capacity adduced by the proponents fully satisfies this test, the nephews' evidence does not contradict the testimony of those present when the will was executed, and we hold that their evidence was insufficient to raise a jury question.

The nephews contend that even if the evidence is "insufficient to establish lack of testamentary capacity, the evidence of Mr. Pace's mental condition . . . is highly relevant on the issue of undue influence." Before addressing the undue influence issue, we will review the testimony the nephews cite as evidence of the testator's mental impairment.

Murrell S. Jackson, a local business man, had known Mr. Pace for 40 years as "a real sharp old fellow." In the summer of 1980, he noticed "a drastic change." "He was very vague," Jackson said, "he was disoriented, he was confused, and I don't think he knew who I was." W. B. Waldorf, the testator's pastor, described

an incident at church when Mr. Pace abruptly refused to accept an offer of a religious magazine. Waldorf discontinued his pastoral visits in Mr. Pace's home in 1980 or 1981. He explained that Mr. Pace "would not look at me when I talked to him . . . and I felt uncomfortable in his presence. He acted like he did not want me there."

Rebecca Hamilton, who lived during the summers in a home near Mr. Pace, testified that "he was always very stubborn, very alert, very opinionated . . . a very tough character." In the summer of 1979, she "noticed that he was vaguer, he was more irrational, he flew off the handle much more easily. He had his fears and he had his hates and he suddenly dropped religion . . . . He kept telling me . . . something awful is going to happen here." When the witness saw him in August 1981, she was "shocked that . . . he'd become so senile."

Lucille Buck had known the testator since the death of his wife and had exchanged visits with him frequently. Buck testified that he became fearful, kept a shotgun by his bed, and offered her a pistol and a knife for her protection. In the summer of 1978, she said, "we went out in the garden to pick the tomatoes, and all of a sudden he started pulling all the tomatoes off, pitching them off down the hill". He told her that they had been damaged by "radium, from the sun" and that he was afraid for her to eat them. Theresa Pace, Montie's wife, testified that Mr. Pace lost his taste for tomatoes because he was concerned about the effects of radium.

Ruby Staley, Theresa Pace's mother, testified that Mr. Pace began refusing invitations to family gatherings in August 1978. During a conversation she held with him in 1979, she said that he "kept his head bowed the whole time he talked to me", and "in his later years . . . he began to break his word to us" and invented excuses to decline invitations.

Kenneth Wade described an incident which occurred on one of his visits. He said that Mr. Pace "always kept his bedroom door locked and he couldn't find his key to his bedroom, so he sat up in the chair all night and worried about his key". Wade testified that Mr. Pace "demonstrated his strategy for unexpected guests. He got his pistol out of the bedroom and he took me to the door and he had a little peep hole in the door that he could look out into his garage, and he had a string that he could jerk the light on and then he could draw his pistol up to see who was there."

Patricia Trainum, a neighbor, baked some rolls for the testator and asked her husband to deliver them. She stated that Mr. Pace "opened the door and he took the rolls and shut the door in my husband's face." Myrtie Donnelly met Mr. Pace in the grocery store "two or three months before he died". The witness said that "he just didn't look like himself, he didn't act like himself . . . he didn't smile or anything", and contrary to custom, "he seemed in sort of a hurry" and left the store without waiting to talk with her.

We will now summarize the testimony upon which the nephews rely as evidence of "circumstances indicative of undue influence". They contend that the testimony and the inferences it raises show that Mr. Pace "was susceptible to undue influence . . . because of his age . . . senility and weakmindedness" and that "Mr. and Mrs. Ingalls drove a wedge between the old man and his family."

Theresa Pace and her husband Montie frequently invited the testator to their home for meals and picnics. He failed to appear for dinner on Thanksgiving Day in 1978 and, thereafter, stopped accepting invitations to family gatherings. Mrs. Ingalls helped Mr. Pace redecorate his apartment, and family pictures displayed on his bookcase disappeared. Mr. Pace removed his telephone and television set, explaining that he could use the Ingallses' equipment when he needed it.

Lucille Buck testified that, after the apartment was redecorated, "things were disappearing all along". Mr. Pace told her that Mrs. Ingalls did most of his cleaning and cooking and mended his clothes. After Mr. Pace had removed his telephone, Buck called Mrs. Ingalls and asked to speak with Mr. Pace about an urgent matter. Buck testified that "she said he doesn't want to be bothered and slammed the phone down." Mr. Pace called Buck shortly before his death, told her Mr. and Mrs. Ingalls are "out right now" and asked her to "please come out here, I need to talk to you." Buck said that "he was frantic." For personal reasons, Buck was unable to leave home at that time.

Rebecca Hamilton and Mr. Pace corresponded often. "[H]e wrote his own letters", she said, "and then suddenly Mrs. Ingalls wrote for him" and "[s]he signed his name". Theresa Pace and her aunt, Louise Bogard, delivered a portion of their Thanksgiving dinner to Mr. Pace in 1978, 1979, and 1980. Bogard remembered that "Mrs. Ingalls stood over the bannisters the whole time we were there, she never left." Ruby Staley said that whenever she

visited Mr. Pace, Mrs. Ingalls "was always there or she came soon after we arrived." Fred Merchant, who did some plumbing work for Mr. Pace, testified that Mrs. Ingalls would often come down, stand around, and listen to their conversations until he left. Roy Morris delivered building blocks to Mr. Pace in 1980. Morris said that Mrs. Ingalls "come out on the carport and stood there and watched". Carolyn Steele, who first met Mr. Pace in November 1979, testified that "Mr. Ingalls came down, wanted to know who I was and what I was doing there." His only concern, she said, "seemed to be to get me out of there."

The nephews point to additional testimony which, they contend, supports an inference that "Ann Ingalls . . . may have been [Mr. Pace's] mistress." Lucille Buck testified that sometime in 1972 Mr. Pace "told me if I would marry him that everything would be mine." When Buck visited in his home, Mrs. Ingalls "would . . . ask me what I was looking for or who I wanted to see." "[A] lot of times", she continued, "we got cut off during a [telephone] conversation." There was no interior access between the apartments in Mr. Pace's house, and he constructed an outside staircase. Buck testified that Mrs. Ingalls had asked him to build the steps "so she wouldn't have to go all the way around front to get to his apartment."

Juanita Pace, Hamilton's wife observed Mrs. Ingalls "[c]oming down the steps in her bathrobe and entering the door at the bottom." She saw her and Mr. Pace together "constantly in the yard and the garden" and "[s]he very seldom ever left his side." Ruby Staley and Patricia Trainum testified to the same effect. Audrey Carpenter and Peggy Kidd frequently saw Mrs. Ingalls in the yard with Mr. Pace.

The nephews called the Ingallses as adverse witnesses. Ann Ingalls testified that she cooked a meal for Mr. Pace only once and remembered only one letter she had written for him. She denied that she mended his clothes, redecorated his apartment, gave him books, or screened his visitors. Asked if she had visited him in his apartment, she said, "Maybe on a Wednesday." She explained that Mr. Pace shopped on Thursdays and had instructed her that if she needed anything from the store she "had to see him on Wednesday." She acknowledged that she often met him in the yard and garden. Responding to another question, she denied that she and her husband grew "closer and closer to Mr. Pace the longer [they] lived at his house". "He never called me Ann, he

always called me Mrs. Ingalls", she said, and he called her husband Mr. Ingalls. Counsel inquired whether Mr. Pace kept her informed of his whereabouts and whether she was "concerned as to where he was". Mrs. Ingalls replied, "No. He was no relation to me. He was nothing to me." Mrs. Ingalls first learned about the contents of Mr. Pace's will "[w]hen Mr. Richmond called us and they read the will."

Lyle Ingalls testified that Mr. Pace's realtor required him to sign a new lease every year. Mr. Ingalls assisted his landlord in painting, mowing, plumbing, and repair work on the house, truck, and lawnmower. He installed a door bell on the exterior door and bored "a hole in the door for him so he could look out." Although Mr. Pace had a driver's license and drove his own truck until he died, Mr. Ingalls sometimes drove it for him. He drove him to the bank on two occasions, once to deposit money and once to rent a safety deposit box. Mr. Ingalls knew that Mr. Pace had some bonds and the money he had received from the sale of the Glenhaven farm. He acknowledged that Mr. Pace had made him a gift of some of the bonds.

On January 4, 1979, Mr. Pace asked Lyle Ingalls to take him to Dr. Carter's office. Following that visit, Mr. Pace wanted to go to Richmond's law office. Mr. Ingalls remained in the reception room while Mr. Pace was with Richmond in an inner office. Mr. Ingalls testified that he did not know the purpose of the visit to the lawyer's office. He stated that "about a year or so later" Mr. Pace "said something about Mr. Yager might own the house he was living in" and "he might have let it slip that I might own [the Stony Point] house." At some point unclear from the testimony, Mr. Pace told Mr. Ingalls that he had named him one of the executors of his will and that he should contact Richmond "if anything happened". The Ingallses made the testator's funeral arrangements at Richmond's request.

On brief, the nephews list nine "circumstances" which they contend are sufficient to support a finding of undue influence:

"1. The testator was old . . . . 2. The testator was susceptible to undue influence . . . because of his age . . . senility and weakmindedness . . . . 3. The testator was . . . critically confused in that the reasons given for such bequest [to the Ingallses] did not comport with what several witnesses said was the truth. 4. The testator was . . . particularly susceptible to undue influence because . . . he was 'extremely . . . obviously upset about the loss of

vision in his right eye.' 5. Ann Ingalls was very close to the testator and may have been his mistress. 6. Lyle and Ann Ingalls . . . stood in a relation of confidence and dependence — indeed, in a fiduciary capacity — to the testator. They . . . contribute[d] to the old gentleman's reclusiveness . . . playing upon his overblown fears and convincing him, contrary to fact, that his family had abandoned him. 7. When called upon to explain their relations with the testator, Lyle Ingalls was less than candid and Ann Ingalls was downright dishonest . . . . 8. The alleged will . . . makes an unnatural bequest in that it excludes the testator's kin in favor of his tenants. 9. The testator had previously expressed a different dispositive intent . . . ."

The chancellor ruled that the evidence was insufficient to make out a *prima facie* case of undue influence. This Court has repeatedly and consistently defined what influence is undue. "The undue influence which will vitiate a will must be of such a character as to control the mind and direct the action of the testator." *Core* v. *Core's Adm'rs*, 139 Va. 1, 14, 124 S.E. 453, 457 (1924). "[I]t must be sufficient to destroy free agency on the part of the . . . testator; it must amount to coercion — practically duress. It must be shown to the satisfaction of the court that the party had no free will". *Wood* v. *Wood*, 109 Va. 470, 472, 63 S.E. 994, 995 (1909). "Resistable persuasion, solicitation, advice, suggestions, and importunity do not constitute sufficient evidence of undue influence." *Wilroy* v. *Halbleib*, 214 Va. 442, 446, 201 S.E.2d 598, 601 (1974).

"The burden of showing undue influence rests upon those who allege it, and it cannot be based upon bare suggestion, innuendo, or suspicion." *Core* v. *Core's Adm'rs*, 139 Va. at 14, 124 S.E. at 457. The nephews suspect that Mrs. Ingalls was Mr. Pace's mistress and that she used the illicit relationship to induce him to make his will in her favor. Indeed, they place primary stress upon this "circumstance" and Mr. Ingalls' alleged fiduciary relationship to Mr. Pace. We find nothing of record to show that Mr. Ingalls was more than a helpful friend or that Mrs. Ingalls was engaged with Mr. Pace in a meretricious relationship. Our decision in *Forehand* v. *Sawyer*, 147 Va. 105, 136 S.E. 683 (1927) is instructive. There, the testator was survived by his wife of 34 years. Several years before his death, he and another woman became friends. She accompanied him to his lawyer's office where he executed a will changing the terms of a former will which fa-

vored his wife. By the new will, the testator left his widow a $200 annuity and two mules; the residue of his estate he devised to his new friend. The contestants challenged the will on grounds of undue influence and lack of testamentary capacity, and the jury found a verdict in their favor. Finding the verdict contrary to the evidence, we reversed the decree and remanded the cause with instructions to admit the will to probate.

As the precedents teach, those who accuse another of abusing a personal relationship for selfish gain bear a heavy burden.

> Undue influence . . . is a species of fraud, and so must be proved by clear, cogent and convincing testimony. Influence is not undue which rests upon natural affection and desire to give property to those who are most considerate, attentive and useful to us.

*Thornton* v. *Thornton's Ex'rs*, 141 Va. 232, 240, 126 S.E. 69, 71 (1925).

The nephews argue that, considered collectively, the inferences raised by the testimony they adduced was sufficient to discharge the burden they bore and that the chancellor erred in striking their evidence. We have expressly noted, however, that the question whether testimony tending to show undue influence is sufficiently probative to submit to a jury is a question to be considered by the chancellor at the threshold. In *Wilroy* v. *Halbleib*, we reversed a decree denying probate on the ground the chancellor had erred in refusing to strike evidence of undue influence. "To justify submission of the question of undue influence to a jury", we said, "there must be evidence presented which is sufficient to show that the person executing the will was deprived of his volition to dispose of his property as he wished." 214 Va. at 446, 201 S.E.2d at 601.

Viewing all the testimony and the inferences it is said to raise in the light most favorable to the nephews, and applying the evidentiary standards we have defined, we uphold the chancellor's ruling that the evidence was insufficient to submit the question of undue influence to the jury. *See Gill* v. *Gill*, 219 Va. 1101, 254 S.E.2d 122 (1979) (evidence insufficient as a matter of law).

Finally, the nephews ask us to reverse the decree on the ground "the trial court erred in refusing to receive the depositions of Ann M. Ingalls and Lyle W. Ingalls . . . so far as admissible under the

rules of evidence". The chancellor ruled that counsel would be permitted to use the depositions, but only for purposes of impeachment.

The chancellor's ruling was made more than a year before our decision in *Horne* v. *Milgrim*, 226 Va. 133, 306 S.E.2d 893 (1983). The issue raised by the plaintiff on appeal in that case, one of first impression, required us to construe and apply Rule 4:7(a)(3) which provides that "[t]he deposition of a party . . . may be used by an adverse party for any purpose." Reversing the judgment for the defendant, we held that "a party may, subject to the rules of evidence, introduce an adverse party's discovery deposition as substantive evidence in his own case, whether the deponent is present or not." *Id.* at 138, 306 S.E.2d at 895.

We did not hold, as the nephews seem to think, that exclusion of a party's discovery deposition constitutes reversible error *per se*. We will not reverse a judgment for error in excluding evidence "where it appears from the record that the error . . . could not and did not affect the verdict." *Davidson* v. *Watts*, 111 Va. 394, 398, 69 S.E. 328, 330 (1910). *See* Code § 8.01-678. Stated differently, if, upon consideration of all the evidence, including evidence excluded erroneously, we can conclude that there was no error in the judgment appealed from, we will affirm it. *Rorer Iron Co.* v. *Trout*, 83 Va. 397, 414, 2 S.E. 713, 720 (1887). *See also Semmes* v. *Semmes*, 201 Va. 117, 125, 109 S.E.2d 545, 550 (1959); *Williamson* v. *Commonwealth*, 180 Va. 277, 284, 23 S.E.2d 240, 243 (1942).

The transcript of the proceedings at trial shows that counsel was permitted to use the depositions freely in his efforts to contradict the Ingallses. The nephews' complaint on appeal is that they were denied the right to use the depositions as evidence in chief. Specifically, they contend on brief that the depositions were material as substantive evidence to show that Mr. Ingalls "was a highly evasive witness"; that "Mr. Ingalls' abrupt defensiveness . . . tends to corroborate appellants' contention that Ann Ingalls was intimate with Mr. Pace"; that Mr. Ingalls "steadfastly denied any peculiarity or unusual behavior on the part of Mr. Pace"; that Mr. Ingalls volunteered, even when not asked, to assist Mr. Pace with his chores; that Mr. Ingalls was not candid concerning his knowledge on "the question of the decedent's monies"; and that Mrs. Ingalls contradicted her husband when she "denied that Mr. Pace ever needed Lyle to help him with problems."

■ Although evidence may be relevant, its exclusion does not constitute reversible error if it is merely cumulative. *Eason* v. *Eason*, 203 Va. 246, 254, 123 S.E.2d 361, 367 (1962). We have carefully scrutinized the text of both depositions, and we find nothing relevant to the issues of testamentary capacity and undue influence which was not fairly presented to the jury in live testimony. Considering all the evidence, including what was excluded, we are of opinion that the chancellor's failure to anticipate our interpretation of Rule 4:7(a)(3) was harmless error.

Finding no reversible error in the court below, we will affirm the decree.

*Affirmed.*