PRESENT: All the Justices

MARY ANN WEEDON, INDIVIDUALLY AND
AS EXECUTOR OF THE ESTATE OF
DOROTHY ROSE WEEDON
                                        OPINION BY
v.  Record No. 101901            JUSTICE CLEO E. POWELL
                                     January 13, 2012
LARRY S. WEEDON, ET AL.

             FROM THE CIRCUIT COURT OF KING GEORGE COUNTY
                       Gordon F. Willis, Judge

      In this appeal of the judgment in a will contest, we

determine whether the circuit court erred in 1) determining that

the decedent lacked the requisite testamentary capacity when she

executed her contested will, 2) failing to properly weigh the

evidence of the witnesses at the time of the execution of the

contested will by ruling that the drafting attorney did not have

the right to delegate certain duties owed to the testator, and

3) ruling that the contested will was the result of undue

influence.  We hold that the trial court erred in ruling that

the decedent lacked testamentary capacity and was unduly

influenced when executing the contested will.

                       FACTS AND PROCEEDINGS

      Dorothy Rose Weedon, the decedent, was the mother of five

children: Larry S. Weedon, L. Perry Weedon ("Perry"), Billie

Thomas Weedon, Gloria Weedon Sharp and Mary Ann Weedon.  In

2000, Dorothy was diagnosed with multiple myeloma.  At that

time, Mary Ann decided that she would help take care of her mother.

In 2003, Dorothy contacted J. Richmond Low, Jr., an attorney, for assistance in drafting a will, a power of attorney, and an advanced medical directive.  Low's assistant, Rosalind Garnett, met with Dorothy and characterized her as a woman who was "very adamant" and "once [Dorothy] told you this is what she wanted, you knew that's what she wanted."  When Low met with Dorothy to draft her will, he found her to be a woman of few words who knew what she wanted and got it.[1]  In the 2003 will, Dorothy made a monetary gift to her church. In addition, she gifted a burial plot to Billie, Perry, Larry and Gloria. Mary Ann, Billie and Larry would receive a gift of real property upon Dorothy's death. In the event that Mary Ann predeceased Dorothy, Mary Ann's gift was to be split between Billie and Perry.

As Dorothy's illness progressed, Mary Ann took on additional responsibilities in caring for her mother and spent more time with her, including taking her mother to her dialysis treatments. By 2006, Mary Ann left her job to be able to devote more time to her mother's care.

---

[1] Low met Mary Ann for the first time when Mary Ann sought assistance to probate her mother's 2008 will.

On Christmas Eve of 2006, Dorothy had a quarrel with Billie about Dorothy's unwillingness to allow Gloria into her home for Christmas. Mary Ann witnessed this disagreement and Billie blamed her for it. After the incident, Dorothy informed Mary Ann, Larry and Perry that she was taking Billie out of her will.

In May of 2007, Dorothy contacted Garnett to have Low draft a new will for her. In it, she again gave a monetary gift to her church. She also devised real property to Mary Ann, Perry and Larry, but not Billie. This will provided that should Mary Ann predecease her mother, Billie was not to receive any portion of Mary Ann's share. Dorothy also removed Billie as the alternate agent in her advanced medical directive.

On May 20, 2008, Dorothy was admitted to the Medical Center at the University of Virginia ("UVA Hospital") for an unplanned orthopedic surgery. During the next week to ten days, a number of pain medications were prescribed for and administered to Dorothy, and she was confused at times as a result. During her hospitalization, doctors discovered that surgery was required to regulate Dorothy's blood pressure so that she could continue with dialysis. If Dorothy were required to stop dialysis treatments, doctors expected that she would lapse into a coma within 72 hours.

When the doctor told Dorothy the prognosis, she simply stated that she wanted to contact Low. Mary Ann described her

mother's mental state at the time as being "fine." Mary Ann suggested that Dorothy wait until after her surgery to contact Low but Dorothy insisted that she wanted to do it then. Paula Capobianco, a social worker in the palliative care unit, told Mary Ann that she should help Dorothy contact Low before her surgery so that she could have her affairs in order and have some measure of peace.

On June 19, 2008, Garnett received a telephone call from Mary Ann who told her that Dorothy was going to have surgery and wanted to change her will. Garnett remembered Dorothy as a previous client. Garnett told Mary Ann that Low was out of the office but that she would get back to Mary Ann and Dorothy as soon as she had spoken to Low. When Garnett spoke to Low, he told her to call back and speak directly with Dorothy. Garnett knew this to mean that she was to determine if Dorothy was mentally competent to execute a will.

When Garnett spoke with Dorothy, she recognized Dorothy's voice.[2] Garnett explained to Dorothy that they would need to go through each provision in her 2007 will even though Dorothy had already told Garnett that she desired to give everything to Mary Ann. In response to each bequest of real property in the 2007 will, Dorothy stated that she wanted Mary Ann to get each item.

---

[2] When asked to describe how Dorothy's voice sounded, Garnett said that it sounded "very fine."

Garnett did not review the sections that were already making gifts to Mary Ann.  Garnett made notes on a copy of the 2007 will as she spoke with Dorothy.

Dorothy asked that the new will be drawn up immediately because she was having surgery soon.  Garnett testified that Dorothy's voice sounded "exactly the same" as it did when they spoke in 2007 regarding the modifications to the 2003 will. When asked whether she had any concerns that someone was pressuring Dorothy to make this change, Garnett responded "[a]bsolutely not."  Although Garnett did not specifically inquire as to Dorothy's mental capacity, she was confident that Dorothy knew what she was doing and was doing what she wanted. Garnett denied that there was anything in Dorothy's voice that would indicate that she was being threatened to leave everything to Mary Ann.

After this initial phone call, Garnett realized that she had not reviewed the section about the burial plots with Dorothy, so she called her back.  Mary Ann answered the phone and Garnett asked her to ask Dorothy what she wanted to do with the plots.  Dorothy said that she wanted to keep the plots as planned in the 2007 will but informed Garnett that there were three additional plots.  She said that she would like to use one plot herself and would like to leave the remaining two to Mary Ann.

Upon his return to the office, Low drafted a new will using Garnett's notes. Low did not speak with Dorothy or Mary Ann nor did he meet with Dorothy. Based on what Garnett told him, he believed that Dorothy "was of herself, knew what she was doing, and that nobody was going to hold a gun to her head." Low trusted Garnett's judgment of Dorothy's mental state because Garnett had been his assistant since 1993 or 1994. After Low made the changes to the will, Garnett typed it and faxed it to a social worker in Charlottesville.

Mary Ann was present when her mother executed the will in the presence of Capobianco, Vicki Marsh, and Betsy Townsend. Marsh is a patient representative at UVA Hospital. Marsh served as a witness to the execution of the will, but she could not remember who asked her to do so. Marsh did not recall many specifics of this will execution but she knew that they "would not have witnessed . . . the document if [Dorothy] was not alert."

Capobianco also witnessed Dorothy execute her 2008 will, but she later testified that she could not testify to Dorothy's mental capacity at that time. Like Marsh, Capobianco did not recall many details from that day. However, she explained that she would have declined to witness the execution of the will had she had any concerns about the proceeding. She testified that Dorothy signed without assistance. Capobianco described Dorothy

6

as alert and stated that she was able to sit up by herself.  At no time during the execution of the will did she think that Dorothy appeared confused or disinterested.  In fact, Capobianco testified that during her hospital stay, Dorothy was only confused once or twice because of "some trouble I think related to infection."

Townsend, a patient representative, served as the notary during the execution of Dorothy's will.  In her capacity as a patient representative and notary, Townsend has refused to serve as a notary when "it's either obvious that the patient is not even awake enough to, or capable enough to understand or to talk to or whatever, or if I go up and one of the staff says this person is not competent . . . ."  Townsend had no recollection of serving as the notary in this case.

The next day, during the surgery, the lower lobe of Dorothy's left lung collapsed.  On the morning of Monday, June 23, 2008, Dorothy was "agitated and not doing well."  Mary Ann called her siblings.  Dorothy died later that day.

In addition to gifts made in her will, Dorothy left a certificate of deposit for Gloria, valued at $5,700, and another certificate of deposit for Mary Ann, valued at approximately $16,000.

Following Dorothy's death, Mary Ann probated the 2008 will and qualified as executor for the 2008 will.  Larry, Perry,

7

Billie, and Gloria sued Mary Ann, individually and as executor,[3] to challenge the 2008 will. At the trial, the circuit court allowed Dr. Frederick A. Phillips, the medical examiner for the City of Fredericksburg and surrounding counties, to be qualified, over Mary Ann's objection, as an expert to give "an opinion as to a person's mental state as it relates to the cause of death." Based solely on a review of Dorothy's medical records, Dr. Phillips opined that during the last week of her life, Dorothy would have been confused with intervals of lucidity. He further testified that "[c]ommunication skills would be I think – I know would be quite limited." He opined that she "would become less responsible for her words, her thoughts, her activities. She would be literally in a chemical fog, if you will."

In support of their argument that the 2008 will was not valid, Gloria, Billie, Larry and Perry generally blamed Mary Ann for that will. Gloria and Billie believed that their mother was very protective of Mary Ann and Larry said that Dorothy often told him that she had to do things for Mary Ann because "she hasn't got anybody." They all claimed to have a good relationship with their mother. Despite this, Gloria admitted

---

[3] Hanover Baptist Church was also named as a defendant in this action. However, the claims against Hanover Baptist Church were dismissed with prejudice by a Consent Order dated February 12, 2010.

8

that she had not visited her mother during hospitalizations since 2006 or 2007 because she received an email from Perry or his wife telling her not to visit because it was too upsetting for Dorothy. The children also stated that they helped their mother financially and physically by taking her to appointments and doing work around her home.

With the exception of Gloria, the children described visiting their mother in the hospital. They opined that Dorothy's health was deteriorating during this time. Billie stated that Dorothy did not immediately recognize him when he came to visit. He described a telephone conversation that he overheard her have with Mary Ann on June 16th as "disoriented." He said that on most visits, "you had to extract a response from [Dorothy]." Perry testified that around June 14 or 15, he brought Dorothy her favorite food but she had no interest in eating it. Larry said that on June 15, his mother stopped calling him by the nickname she gave him at birth, and he counts that as the day that she died. He also testified that Dorothy often called him by his brothers' names or referred to his children by the wrong names.

Larry and Perry claimed that Mary Ann attempted to deny them access to their mother and her doctors. Without going into specifics, Perry testified that Dorothy frequently told him things that she did not want Mary Ann to hear.

9

Nancy Cable testified as a rebuttal witness on behalf of Mary Ann.  Nancy testified that she knew Dorothy "very well" from 1992 until her death in 2008.  In fact, in 2003 and 2007, Nancy served as a witness for Dorothy's wills, but she never read the wills nor did Low read the wills to her.  Nancy also testified that she is "close, personal friends" with Mary Ann.  Nancy denied that her relationship with Mary Ann had any effect on her testimony.

Nancy saw Dorothy on June 1, 2008 and then again on June 22, 2008.  Nancy described Dorothy as being much weaker and thinner than the last time she had seen Dorothy.  She also testified that Dorothy had difficulty getting comfortable.

Nancy testified that when she visited Dorothy on June 22, 2008, the day before Dorothy died, Dorothy immediately recognized her and that they began "talking about everything" including Nancy's recent travels.  Nancy agreed to Dorothy's request that she spend the night with her.  During this time, conversation would stop and then resume.  At one point, Dorothy mentioned that she had decided to change her will.  Dorothy also mentioned that she had not seen Perry since Nancy had left on June 1.  Nancy said that Dorothy told her "very declaratively" that she wanted "Mary Ann [to] have what she had."  The two then talked about Nancy's children and her doctors.  Nancy brought her food from the cafeteria.  During the night of June 22 and

the early morning hours of June 23, the chaplain came in several times and the three prayed. Dorothy requested the Lord's Prayer but did not say it. Nancy did not know whether Dorothy could not or chose not to say it. Dorothy died later that day.

At the conclusion of the evidence, the trial court found that Dorothy became more mentally and physically "feeble" during her hospitalization, but she still had "periods of lucidity." The court noted that Dorothy was unable to make the telephone call to Low's office by herself and that Mary Ann read the 2008 will to Dorothy before it was executed.

The court held that Mary Ann had not carried her burden to show that Dorothy had testamentary capacity at the time the will was drafted.

> In cases like this, there are certain protections that occur when a lawyer is directly involved with someone who wishes to have a Will drafted. The lawyer has certain professional fiduciary duties to see that certain thresholds are reached in drafting the Will. I don't think those professional duties can be delegated to a non-attorney; or if they are, then the protections are weakened. I don't think an attorney can rely solely on the representations of a non-attorney employee to reach certain decisions that are required by a professional in drafting a Will and seeing that Will is properly executed for a client. It is a factor that the Court has to consider in reaching its decision here today.

The trial court reiterated that "[a]ll of Mr. Low's efforts on June 19th, of 2008, on behalf of Dorothy Rose Weedon, were done through Mrs. Garnett and primarily Mary Ann Weedon."

The court further ruled that

the proponent has failed to carry its burden to show that at the time that the Will was signed, the June 19th, 2008 Will, that [Dorothy] had testamentary capacity at that time. That is based on the lack of relationship directly with the attorney who drafted the Will and even more so – there's even more of a disconnect between the attorney and the decedent with regard to its execution.

The trial court further held that even if Mary Ann had proven that Dorothy had the requisite testamentary capacity at the time that she executed the will, "the opponent of the Will has shown by clear and convincing evidence that there was undue influence in this case." In support of this holding, the court specifically found that

the decedent was feeble in mind and body at the time the Will was executed. There was obviously a very close, confidential, and fiduciary relationship between Mary Ann Weedon and the decedent. Mary Ann Weedon had her Power of Attorney and had been her primary caretaker, based on the evidence, over the last couple of years. And the testator had obviously previously expressed a contrary intention in the 2007 Will with regards to the disposition of her property.

Accordingly, the trial court ruled that the 2008 will had been impeached and the 2007 will should proceed to probate.

12

## II. ANALYSIS

### A. Testamentary Capacity

The proponent of a will bears the burden of proving by a preponderance of the evidence that at the time the testatrix executed her will she possessed testamentary capacity, i.e., "'was capable of recollecting her property, the natural objects of her bounty and their claims upon her, knew the business about which she was engaged and how she wished to dispose of the property.'"  Gibbs v. Gibbs, 239 Va. 197, 199, 387 S.E.2d 499, 500 (1990)(quoting Tabb v. Willis, 155 Va. 836, 859, 156 S.E. 556, 564 (1931)).

> [T]he proponent of the will is entitled to a presumption that testamentary capacity existed by proving compliance with all statutory requirements for the valid execution of the will. Once the presumption exists, the contestant then bears the burden of going forward with evidence to overcome this presumption, although the burden of persuasion remains with the proponent.

Id. at 200, 387 S.E.2d at 501.  This presumption arises where the will is

> in writing and signed by the [testatrix] . . . in such manner as to make it manifest that the name is intended as a signature; and moreover, unless it be wholly in the handwriting of the testator, the signature shall be made or the will acknowledged by him in the presence of at least two competent witnesses, present at the same time; and such witnesses shall subscribe the will in the presence of the testator, but no form of attestation shall be necessary.

Code § 64.1-49.

13

"To show incapacity, the contestants need only go forward with evidence sufficient to rebut the presumption of testamentary capacity."  Gibbs, 239 Va. at 200, 387 S.E.2d at 501.  The burden of persuasion remains with the proponent.  Id.  We will not reverse the trial court unless its decision is plainly wrong or without evidence to support it.  See Gilmer v. Brown, 186 Va. 630, 642, 44 S.E.2d 16, 21 (1947) (a trial court's ruling "should not be disturbed unless its conclusions are at variance with the evidence.").

The parties do not appear to question that the will was duly executed.  Therefore, the presumption arises.  We will assume without deciding that the testimony of the opponents of the will was sufficient to overcome this presumption.  Therefore, our focus is on whether Mary Ann successfully produced evidence of Dorothy's testamentary capacity.

The trial court in this case found that Mary Ann did not meet her burden of proving that Dorothy had testamentary capacity at the time that she executed the contested will.  The court largely based this decision on its ruling that Low, the attorney who drafted the will, never met or spoke with Dorothy himself and impermissibly delegated the determination of Dorothy's capacity to his assistant. The basis for this ruling, however, is unsupported by the law.

Although not the subject of the appeal, we recently found testamentary capacity based, in part, on testimony from a paralegal who drafted a will. Parish v. Parish, 281 Va. 191, 195, 704 S.E.2d 99, 102 (2011). There, we reiterated that " '[i]n determining the mental capacity of a testator, great weight is to be attached to the testimony of the draftsman of the will, of the attesting witnesses, and of attending physicians.' " Id. at 200, 704 S.E.2d 105 (quoting Hall v. Hall, 181 Va. 67, 76, 23 S.E.2d 810, 814 (1943)).

Larry attempts to distinguish Parish from the instant case because in Parish, the paralegal who met with the testator drafted the will and here, the assistant evaluated the testator's capacity and noted her desires but the attorney actually drafted the will. Nothing supports this distinction. We have never ruled, nor do we here, that the weight ascribed to the testimony of the professional speaking to the testatrix for the purpose of drafting the will is lessened if that person does not actually draft the will. Here, Garnett spoke with Dorothy regarding the changes to be made to the will. Garnett understood that the purpose of speaking to Dorothy was to assess her testamentary capacity. Garnett testified that she was confident Dorothy knew what she was doing and was doing what she wanted. Thus, the trial court erred as a matter of law in

15

giving diminished weight to Garnett's testimony because she was not the literal "drafter" of the will.

We also conclude that the court erred in placing undue weight on the fact that Dorothy did not place the call to Low's office herself.  The fact that she did not place the call is clearly outweighed by the fact that she spoke with Garnett and clearly expressed her desires as to how she wanted her will changed.

Finally, we hold that the trial court erred in placing more weight on the testimony of Dr. Phillips and Dorothy's children who were not present when she executed the will than it did on the testimony of the witnesses, the notary, and Mary Ann who were present when the will was executed.  " '[I]t is the time of execution of the will that is the critical time for determining testamentary capacity.'  '[T]he testimony of those present at the factum - when the will is executed - is entitled to the greatest consideration.' "  Parish, 281 Va. at 200, 704 S.E.2d at 104 (quoting Thomason v. Carlton, 221 Va. 845, 853, 276 S.E.2d 171, 175 (1981)).  " 'Neither sickness nor impaired intellect is sufficient, standing alone, to render a will invalid.' "  Pace v. Richmond, 231 Va. 216, 219, 343 S.E.2d 59, 61 (1986)(quoting Tate v. Chumbley, 190 Va. 480, 495, 57 S.E.2d 151, 158 (1950)).

16

None of the witnesses testified that Dorothy did anything that caused them concern. Indeed, Capobianco testified that she would have declined to witness the execution of the will had she had any concerns about the proceedings. Moreover, Dr. Phillips testified that Dorothy would have periods of lucidity and nothing from the witnesses involved in the drafting and the execution of the will indicated that Dorothy was not lucid at the time that she executed the contested will. Indeed, both witnesses testified that Dorothy was alert. Finally, the certificate to which the notary affixed her signature stated, in relevant part

> [b]efore me, the undersigned authority, on this day, personally appeared Dorothy Rose Weedon . . . declared to me and to the witnesses in my presence that the said instrument is her last will and testament and that she had willingly signed and executed it in the presence of said witnesses as her free and voluntary act . . . .

Thus, the trial court's decision that Dorothy lacked testamentary capacity is based on an incorrect view of the law and an improper weighing of the evidence. Moreover, it is without evidence to support it.

### B. Undue Influence

We have previously held that

> in the will context "a presumption of undue influence arises when three elements are established: (1) the testator was old when his will was established; (2) he named a beneficiary who stood in a relationship of confidence or

17

> dependence; and (3) he previously had expressed
> an intention to make a contrary disposition of
> his property."

*Parish*, 281 Va. at 202, 704 S.E.2d at 105-06 (quoting *Martin v.*

*Phillips*, 235 Va. 523, 527, 369 S.E.2d 397, 399 (1988)).[4]  Undue

influence must be established by clear and convincing evidence.

*Gibbs v. Gibbs*, 239 Va. 197, 201, 387 S.E.2d 499, 501 (1990).

The evidence here proves that Mary Ann, who was the sole

recipient of all of Dorothy's real property under the contested

will, had a close relationship with her elderly mother and spent

a great deal of time with her.  Mary Ann also had power of

attorney for her mother and had acted in that capacity.  The

evidence also proves that Dorothy had at least two prior wills

that expressed contrary dispositions of her property.  Thus, the

evidence gives rise to the presumption of undue influence, but

this does not end the inquiry.

> "The undue influence which will vitiate a will
> must be of such a character as to control the
> mind and direct the action of the testator."
> "[I]t must be sufficient to destroy free agency
> on the part of the . . . testator; it must amount
> to coercion – practically duress.  It must be
> shown to the satisfaction of the court that the
> party had no free will".  "Resistable persuasion,
> solicitation, advice, suggestions, and

---

[4] We further held in *Parish* that the age and contrary disposition elements that give rise to the presumption were irrelevant in that case as the testator was of a young age when he incurred a severe brain injury and he had no money until he received compensation for that injury.  281 Va. at 202-03, 704 S.E.2d at 106.

importunity do not constitute sufficient evidence of undue influence."

> "The burden of showing undue influence rests upon those who allege it, and it cannot be based upon bare suggestion, innuendo, or suspicion."

Pace, 231 Va. at 224, 343 S.E.2d at 64 (internal quotation marks and citations omitted).

> Not all influence is undue in the legal sense. See generally T. Atkinson, Law of Wills § 55, p. 256, et seq. (2d ed. 1953). "To be classed as 'undue', influence must place the testator in the attitude of saying: 'It is not my will but I must do it.' " Ginter v. Ginter, 101 P. 634, 636 (Kan. 1909). To support a jury verdict of undue influence, the evidence must be "sufficient to show that the person executing the will was deprived of his volition to dispose of his property as he wished. There must be manifest irresistible coercion which controls and directs the testator's actions." Wilroy v. Halbleib, 214 Va. 442, 446, 201 S.E.2d 598, 601 (1974).

Gill v. Gill, 219 Va. 1101, 1105-06, 254 S.E.2d 122, 124 (1979).

In Gill, Dr. John Russell Gill married Patricia Wing Gill in 1957, four years after the death of his first wife. Id. at 1103, 254 S.E.2d at 122. "In 1972, he executed a formal will granting [Patricia] a life estate in a trust and the marital residence, with remainder to his grandchildren. [He] died April 30, 1976 leaving a holographic will dated January 22, 1976 bequeathing five dollars to each of his two sons by his first marriage and the residue of his estate in fee to his widow."

19

Id. at 1103, 254 S.E.2d at 122-23 (footnote omitted).  In that case, the evidence proved that

> gradually over the course of [the] marriage, Mrs. Gill became the dominant spouse, persuading her husband to change his fiscal policies, his religious affiliation, his work routine, his societal views, and his personal habits; that her influence increased as his health declined; that the holographic instrument was not witnessed the day it was dated as Dr. Brown and Markham testified; that, indeed, it was not even written until later at a time when testator was confined to his home, alone with his wife; and that testator wrote and pre-dated the instrument, at his wife's direction, to give the appearance it had been executed in anticipation of surgery.

Id. at 1105, 254 S.E.2d at 124.  Based on this evidence, a jury determined that the January 22, 1976 instrument was not the testator's true last will and testament.  Id. at 1103, 254 S.E.2d at 123.  On appeal, this Court held "as a matter of law that the evidence was insufficient to support a finding of undue influence" and reversed the circuit court.  Id. at 1107, 254 S.E.2d at 125.

"The ultimate burden of proof 'is always upon him who alleges fraud.'"  Id. at 1106, 254 S.E.2d at 125 (quoting Wallen v. Wallen, 107 Va. 131, 150, 57 S.E. 596, 599 (1907)).  Here, the trial court focused on the circumstantial evidence that raised the presumption of undue influence[5] while overlooking the

---

[5] Specifically, the trial court found that "the decedent was feeble in mind and body at the time the Will was executed. There was obviously a very close, confidential, and fiduciary

ultimate inquiry: whether Dorothy's will was overridden.

Although a presumption of undue influence was established, in the final analysis the evidence falls short of establishing undue influence by clear and convincing evidence. The evidence shows that Dorothy had strained relationships with some of her other children and spent more time with Mary Ann than her other children. Even the other children testified that Dorothy was protective of and concerned about Mary Ann. That Billie and Lewis claimed that Mary Ann blocked their access to Dorothy's doctors is of little consequence as it has nothing to do with whether Dorothy executed the 2008 will against her own wishes. [6] As to her previously executed wills, no one asserts that Mary Ann exerted undue influence over Dorothy when either of those wills were drafted even though the first will specifically omitted Gloria and the second will omitted Gloria and Billie from gifts of real property. Garnett testified that in 2003 and

relationship between Mary Ann Weedon and the decedent. Mary Ann Weedon had her Power of Attorney and had been her primary caretaker, based on the evidence, over the last couple of years. And the testator had obviously previously expressed a contrary intention in the 2007 Will with regards to the disposition of her property."

[6] Billie's testimony that while visiting Dorothy in the hospital, he noticed an abrasion on her head should not be afforded undue weight as his observation was clearly removed in time from the day that Dorothy executed her 2008 will. He stated that Dorothy told him that Mary Ann had shoved her up the garage steps because Dorothy was not moving quickly enough. However, Dorothy was hospitalized at the time that Billie noticed the mark and Billie, indeed, referred to the "abrasion" as a scar.

2007, Dorothy knew what she wanted done and demanded that it be done right away. Importantly, Garnett further testified that Dorothy was no different in 2008 when Dorothy decided to draft a new will in advance of impending surgery that could, if not successful, result in her lapsing into a coma and dying.

Indeed, as previously stated, Garnett testified that Dorothy "knew what she was doing and was doing what she wanted."[7] This testimony was in clear contrast to that of the siblings who testified in generalities that they believed that Mary Ann was the reason the will was changed. Perhaps one of the most telling pieces of evidence is the discussion that Dorothy had with Nancy when Mary Ann was not present. On the day before she died, Dorothy volunteered that she had changed her will because she wanted to leave everything to Mary Ann.

Similar to the evidence in Gill, testimony that the beneficiary of the contested will in this case asked the siblings not to visit, was the only sibling who was talking to the doctor, and isolated the testator is insufficient to prove

---

[7] Though relevant to the issue of testamentary capacity, this evidence also has bearing upon undue influence. Much like our reliance on the evidence in Gill, that the testator drafted the January 22, 1976 will entirely in his own handwriting to conclude that it showed "a sedulous act of volition, deliberate and independent of external influence[,]" 219 Va. at 1107, 254 S.E.2d at 125, Garnett's testimony similarly reveals that Dorothy, who was "doing what she wanted," was acting of her own volition and not as the result of external influence.

undue influence by clear and convincing evidence.  Although the evidence in this case certainly proves that Dorothy was very ill, in a great deal of pain, and dying, the contestants did not prove by clear and convincing evidence that Dorothy was in the position of saying " '[i]t is not my will but I must do it.' " Gill, 219 Va. at 1105-06, 254 S.E.2d at 124.  Thus, we conclude that the evidence in this case rebuts the presumption of undue influence.

## III. CONCLUSION[8]

For the foregoing reasons, we will reverse the judgment of trial court and remand with instructions that the 2007 will be withdrawn from probate and that the 2008 will be admitted to probate.

Reversed and remanded.

JUSTICE MIMS, dissenting.

I believe the circuit court's finding that Dorothy was subjected to undue influence was not plainly wrong and that there was evidence to support it.  Therefore I dissent.

---

[8] Mary Ann also assigns error to the trial court's admission of and the weight given to Dr. Phillip's testimony as well as the trial court's failure to rule that the contestants did not have sufficient corroborative evidence to support their allegations of lack of testamentary capacity and undue influence.  Because we hold that the trial court erred in determining that Dorothy lacked testamentary capacity and that she was unduly influenced by Mary Ann, these assignments of error are moot and we decline the invitation to address them.

Upon review of a trial court's finding of undue influence, this Court asks whether that finding was plainly wrong or without evidence to support it. See Parish v. Parish, 281 Va. 191, 201-02, 704 S.E.2d 99, 105 (2011) ("where the case has been fairly presented and there is credible evidence to support the conclusion of the fact-finder, this court will not disturb the verdict") (internal quotation marks omitted); Code § 8.01-680 (judgment of the circuit court "shall not be set aside unless it appears from the evidence that such judgment is plainly wrong or without evidence to support it").

The inquiry of this Court is whether the record contains "credible evidence to support the conclusion" of the circuit court. Id. In my view, there is such credible evidence to support the circuit court's finding that Dorothy was the victim of Mary Ann's undue influence.

I agree with the majority that the evidence in this case is sufficient, using a clear and convincing standard, to trigger the presumption of undue influence pursuant to the factors recently set forth in Parish. See 281 Va. at 202, 704 S.E.2d at 105-06. However, the majority concludes that "the evidence falls short of establishing undue influence by clear and convincing evidence." The majority bases this conclusion on its view "that [Mary Ann's] evidence in this case rebuts the presumption of undue influence."

24

However, the proper inquiry for this Court, on review of the circuit court's finding of undue influence, is different. This Court must determine whether the trial judge was plainly wrong when he assessed the credibility of the witnesses and weighed their testimony to conclude that Mary Ann failed to rebut the presumption of undue influence.

After the presumption of undue influence arose, "the burden of producing evidence tending to rebut the presumption shift[ed] to" Mary Ann. Id. at 203, 704 S.E.2d at 106. Yet a review of Mary Ann's evidence shows that it was predominantly focused upon rebutting the allegation of testamentary incapacity and only touched peripherally upon the question of undue influence.

The majority relies upon four aspects of the evidence to conclude that the presumption of undue influence had been overcome. I will examine each in turn.

First, the majority notes that Dorothy had strained relationships with some of her other children and spent more time with Mary Ann. While both of these facts are true, their bearing upon the issue of undue influence is not readily apparent. Second, the majority emphasizes that Dorothy was protective of and concerned about Mary Ann. Likewise, this is true, but it does not adequately explain why Dorothy, mere days before her death and with reduced mental capacity, would make a

25

dramatic alteration of her testamentary wishes for Mary Ann's benefit.

The majority assigns importance to Garnett's testimony that "in 2003 and 2007, Dorothy knew what she wanted done and demanded that it be done right away [and she] was no different in 2008." This evidence may be more relevant to capacity than undue influence. In fact, it may bolster the undue influence presumption rather than refute it, because in both 2003 and 2007 there was a precipitating causal event that angered Dorothy that was not present in 2008. In 2003, Dorothy disinherited Gloria after Gloria told the church minister that Dorothy was ill. In 2007, Dorothy disinherited Billie after a confrontation in her trailer regarding Gloria being with the family for Christmas.

Finally, the majority relies upon Nancy's testimony that Dorothy volunteered that she wanted to leave everything to Mary Ann. While not doubting the veracity of this statement, one must question whether it is an expression of her free will or further evidence of the pervasiveness of the undue influence. I would not disturb the conclusion of the trial judge, who saw and heard all the witnesses, determined their credibility, and weighed their testimony. See Mastin v. Theirjung, 238 Va. 434, 438-39, 384 S.E.2d 86, 88 (1989) (finder of fact is "sole judge[] of the weight and credibility of the evidence").

26

The record is replete with additional testimony regarding Mary Ann's unusual and domineering relationship with Dorothy, especially in the final sad weeks of Dorothy's life. Lewis characterized that relationship as Dorothy being afraid of Mary Ann "get[ting] mad" and "throwing a fit on her." Most tellingly, Mary Ann spent approximately 12 hours per day alone with her in the hospital and limited her siblings' access to their mother. In the hospital, Dorothy was confused as to the identities of her children and grandchildren and was curled up in a fetal position much of the day, reluctant to contravene Mary Ann's wishes.

Billie testified that during one of his visits to the hospital, he asked Dorothy about an abrasion on her head. Dorothy told him that Mary Ann shoved her up the garage steps at Mary Ann's house, and that she fell into a wall. Billie also testified that Mary Ann used her power of attorney to block her siblings' access to Dorothy's doctors. Lewis testified that Mary Ann threatened to have him "locked up" for visiting his mother in the hospital. He testified that on another occasion, he spoke with his mother on the phone about visiting, but that she called back a few minutes later and, with Mary Ann in the background commanding her to cancel the visit, submitted to Mary Ann's demand.

In light of this evidence, the trial judge reasonably could give less credibility to the testimony of Mary Ann, who at trial was the sole witness regarding what transpired when Dorothy decided to draft a new will.  For these reasons, I believe we should defer to the circuit court and I cannot conclude that its finding of undue influence was plainly wrong or without evidence to support it.

For these reasons I dissent.


JUSTICE MCCLANAHAN, dissenting.

Regarding the issue of undue influence, I agree with Justice Mims.  However, because I would affirm the trial court on the issue of testamentary capacity, it is not necessary to address the issue of undue influence, and therefore I dissent separately.

"A trial court sitting without a jury is the judge of the weight of the testimony and the credibility of the witnesses." Government Emples. Ins. Co. v. United Servs. Auto. Ass'n, 281 Va. 647, 655, 708 S.E.2d 877, 882 (2011).  "Nevertheless, '[t]here must be some evidence in order to support the verdict.' "  Id. (quoting Barnes v. Hampton, 149 Va. 740, 744, 141 S.E. 836, 837 (1928)).  In the instant case, on the issue of testamentary capacity, if one gives more credence and weight to the testimony of the medical examiner and the siblings, the

conclusion reached by the trial court follows. On the other hand, if more credence and weight is given to the testimony of Mary Ann, the social worker and the patient representatives, one may come to the conclusion reached by the majority in this case. It is not the appellate function, however, to engage in such reweighing.

"To overcome the presumption of [testamentary] capacity, we do not require clear and convincing proof; rather 'the contestants need only go forward with evidence sufficient to rebut the presumption.' " Parish v. Parish, 281 Va. 191, 199, 704 S.E.2d 99, 104 (2011) (quoting Gibbs v. Gibbs, 239 Va. 197, 201, 387 S.E.2d 499, 501 (1990)). Here, there were facts before the circuit court sufficient to rebut the presumption, and I would not substitute my judgment on the credibility of witnesses and the weight accorded their testimony. See Commonwealth v. Jackson, 276 Va. 184, 197, 661 S.E.2d 810, 816 (2008) (" '[T]he credibility of witnesses and the weight accorded their testimony are matters solely for the fact finder who has the opportunity of seeing and hearing the witnesses.' " (quoting Schneider v. Commonwealth, 230 Va. 379, 382, 337 S.E.2d 735, 736-37 (1985)).