COURT OF APPEALS OF VIRGINIA

Present:   Judges Raphael, Lorish and Callins
Argued at Lexington, Virginia

**UNPUBLISHED**

ROBERT DUNN HUDSON

MEMORANDUM OPINION* BY
v.       Record No. 1369-22-3          JUDGE LISA M. LORISH
OCTOBER 24, 2023

LYNSEY ALEXIS MASSIE, ET AL.

FROM THE CIRCUIT COURT OF WASHINGTON COUNTY
Malfourd W. Trumbo, Judge Designate

Timothy W. McAfee (McAfee Law Firm, PLLC, on briefs), for
appellant.

(Kimberly C. Haugh; Brandie I. Lester, Guardian ad litem for the
minor children; Kimberly C. Haugh, P.C.; Brandie I. Lester,
Attorney at Law, PLLC, on brief), for appellees.  Appellees and
Guardian at litem submitting on brief.

Robert Dunn Hudson and Lynsey Alexis Massie had two children together.  After their

relationship ended in 2016, Lynsey had full legal and physical custody over both children.

Lynsey then married Michael Ross Massie, II.  Together, the Massies petitioned to adopt the two

minor children born to Lynsey and Hudson, over Hudson's objection.  We affirm the trial court's

conclusion that Hudson's withholding of his consent was "contrary to the best interests of the

child" under Code § 63.2-1205.

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

BACKGROUND[1]

Lynsey and Hudson began dating in 2013. Lynsey gave birth to one of the adoptive children that year, and the other was born in 2015. The pair lived together with the children until the end of 2016. At that point, Lynsey and Hudson's relationship ended, after at least two incidents of domestic violence. In one, occurring in November 2016, Lynsey sustained serious injuries from Hudson, requiring the placement of six staples in her head. Just one month later, in December 2016, there was another domestic violence incident in which Hudson physically harmed Lynsey, giving her a fractured arm, and Lynsey shot Hudson in the back with a firearm. Hudson was criminally charged in connection with the incident.

Following these instances of domestic violence, Lynsey and the adoptive children moved in with Lynsey's mother, and Lynsey's parents provided financial support for Lynsey and the children through November 2018—until Lynsey moved in with Michael. Hudson also entered a new relationship with a woman named Shawna Russ, and the pair lived in Bristol, Tennessee throughout 2018. Russ's child lived with them until Child Protective Services (CPS) began investigating Hudson for potentially abusing the child in January 2019. The couple then spent a few months in Georgia waiting for a house in Johnson City, Tennessee that they eventually moved into.

Meanwhile, from December 2016 to August 2018, a protective order prevented Hudson from seeing the adoptive children, and he did not visit with them until after he was acquitted of the criminal charges stemming from the December 2016 incident. In August 2018, the Washington County Circuit Court entered an order granting Lynsey sole legal and physical

---

[1] "In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the prevailing party at trial." *Norfolk S. Ry. Co. v. Sumner*, 297 Va. 35, 37 (2019).

custody of the children and giving Hudson visitation rights. About five months after the court's July 2018 hearing on custody and visitation, however, Lynsey moved to rehear, alleging that she had learned of a "domestic issue" that occurred before the visitation hearing, in which "the victim was Robert Hudson and the Defendant was his girlfriend who continues to reside with him." The court denied the motion on January 23, 2019, and entered an order with a copy of the schedule of visitation originally issued in August.[2] The schedule provided that Hudson could see the children on alternating weekends, as well as Father's Day and portions of the Thanksgiving holiday, Christmas holiday, and summer vacation.

From August 2018 to January 2019, regular visitation between Hudson and the children—consistent with the court's order—occurred without incident. In January 2019, however, Lynsey received a call from CPS in Tennessee, informing her that "there had been an incident" in Hudson's home and asking her if her children were safe. The caller told Lynsey that she could not provide any more details about the ongoing investigation. Based on that call, Lynsey decided not to allow any further contact between Hudson and the children until she got more information.[3]

---

[2] The court did not address the merits of Lynsey's allegations in the order entered on January 23, 2019.

[3] Lynsey cut off in-person contact as well as phone calls with Hudson and his parents. She testified that phone calls were a threat to the children's safety because she was worried Hudson might say something to confuse or scare them. She also said that Hudson's family was present for incidents of domestic violence committed by Hudson against Lynsey and that they never reported these incidents to the police. The trial court's visitation order did not give either Hudson or the child's grandparents rights to contact the children by phone.

Lynsey then petitioned for court-ordered child support. After multiple hearings to address the request, Hudson failed to appear at a hearing in September 2019 and the court issued a capias.[4]

Text messages between Hudson and Lynsey show that after Lynsey first prohibited visitation, Hudson waited six months to request visitation again. When Hudson texted Lynsey in June 2019 asking to see the children, he represented that the Tennessee investigation was over, but when Lynsey requested proof, Hudson did not provide any additional information. Hudson waited three more months, until September 2019, to again ask to visit the children. He made repeated additional requests to see the children, or speak with them by phone, throughout the fall of 2019, with the last request coming in December 2019. Hudson also told Lynsey that he could provide her and the children with financial support, and offered to send them clothing or other items.

Lynsey denied Hudson's requests for visitation and informal offers of support. She repeatedly asked Hudson to resolve visitation and child support through the court system, and to provide evidence that the Tennessee investigation was resolved and that he had a safe home environment for the children. Hudson never provided proof, and never paid any financial support to the children. Hudson's last request to see the children was on Christmas Day in 2019. In July 2020, about one and a half years after Lynsey first prevented Hudson from visiting the children, Hudson filed a motion with the court to enforce his visitation rights.

While Hudson's motion for visitation was pending, the Massies jointly petitioned for adoption. They asked the court to enter an order granting an adoption to Michael Ross Massie

---

[4] The capias was ultimately dismissed because the child support proceeding was terminated when Lynsey and Michael filed for adoption.

and terminating the rights of the children's natural father, Robert Dunn Hudson.[5]  The petition

stated that Lynsey is the birth parent of both children, that the Massies started dating in 2017,

have lived together with the children since 2018, and have married.  The Massies also have a

separate child, born in January 2019, living with them and the adoptive children.  The Massies

alleged that the court should terminate Hudson's parental rights on the grounds of "(a)

abandonment, (b) failure to provide child support, (c) lack of parental relationship and (d) a

volatile and abusive environment that is detrimental to the adoptive children."  In support of this

prayer for relief, the petition alleged that Hudson had been investigated for child abuse by

Tennessee CPS in 2019, Hudson failed to appear in court for four scheduled child support

hearings, and the "only relationship [Hudson] has had with the adoptive children lasted for five

months," between August and December 2018.  The petition also alleged that Hudson's partner,

Shawna Russ, had been arrested in August 2019 for an assault against Hudson.  With the filing

of the adoption petition, the Massies withdrew the request for child support from Hudson.

The Washington County Circuit Court heard three days of testimony on the petition for

adoption.[6]  A guardian ad litem appointed to represent the two children appeared on each day

and recommended to the court that it was in the best interests of the children to be adopted by

their stepfather.

At trial, Lynsey testified about her marriage to Michael Massie, that the couple was

financially able to support the children, and that Michael had a good relationship with both kids.

She also testified that she had suffered domestic violence at the hands of Hudson, as detailed

---

[5] The petition also asked the court to change the last names of the children to Massie and issue a new birth certificate reflecting the adoption.

[6] Transcripts are not available for the first and third hearings because of technical issues with the court reporting equipment.  The parties filed statements in lieu of transcripts reflecting the testimony from those hearings.

above. Lynsey acknowledged that while Hudson had been criminally charged in connection with the December 2016 incident, he was acquitted at trial, and that during this incident she shot him in the back. Lynsey also testified that, at her request, she and Hudson have communicated only via text since 2018.

Lynsey agreed that Hudson had not seen the children since December 2018 "partially because of [her]" and that she had intended to violate the court order giving Hudson visitation rights because Hudson failed to provide her any information about the investigation in Tennessee, despite her requests for him to do so.

During Hudson's testimony, he admitted that the children were present in the home during multiple instances of domestic violence between him and Lynsey, including the incident that ended with Lynsey shooting him in December 2016. Hudson acknowledged that after the November 2016 incident, Lynsey had to have six staples placed in the back of her head. He also admitted that the Tennessee CPS suspected him of abusing Russ's child. The suspected abuse resulted in a fractured nose and a cut on the child's ear. Hudson said that he agreed to a no-contact order prohibiting him from seeing the child while the investigation was ongoing. Rather than leave the home where he was residing with the child, however, Hudson continued to live there with the child's mother while the child went to live with his birth father.[7] Hudson explained that he "was told that the case in family court would be dismissed if I just went to a parenting class, which I did." CPS did dismiss its investigation against Hudson, and it was ultimately ruled "unfounded."

Hudson acknowledged that he did not initiate any court actions to compel visitation until July 2020, about one and a half years after Lynsey first decided to stop visitation. He also

---

[7] Hudson testified the child's mother would not agree to live separately from Hudson.

- 6 -

acknowledged that he was bound by a visitation order specifying that visitation with his children could only occur in Bristol, Tennessee or certain locations in Virginia, but Hudson moved from Bristol to Georgia, then to Johnson City, Tennessee, in December 2019.

Hudson also testified that while he is "willing and able to have custody of" the children, he did not want to significantly change how long they spend with their mother. He requested a "transition period" of visitation, including visitation every other weekend and holidays.

The trial court ultimately found for the Massies and granted the petition for adoption. Hudson appeals.

## ANALYSIS

I. The trial court did not commit reversible error in granting the petition for adoption.

"Any natural person who resides in the Commonwealth" may petition for the adoption of a minor child. Code § 63.2-1201. The law provides for a specific process when a birth parent has a new partner, and that partner wants to become a legally recognized parent to the children: the partner must file a petition, and the birth parent "shall unite in the petition for the purpose of indicating consent." *Id.*

Generally, the other birth parent who does not join the petition for adoption must also provide written consent to the adoption. But there are several exceptions where consent is not required. Two are relevant here. The trial court may grant an adoption against the wishes of a person "whose consent is required" if it finds they are withholding consent "contrary to the best interests of the child." Code § 63.2-1205. Alternatively, "[n]o consent shall be required of a birth parent who, without just cause, has neither visited nor contacted the child for a period of six months immediately prior to the filing of the petition for adoption or the filing of a petition to accept consent to an adoption." Code § 63.2-1202(H). After a trial on the Massies' petition for adoption, the trial court held that Hudson's consent was not required because he met the criteria

in Code § 63.2-1202(H).  The court further held that even if consent was required, it was withheld contrary to the children's best interests under Code § 63.2-1205.[8]

We assume without deciding that Hudson's consent was required because Lynsey prevented him from visiting or contacting the children after January 2019.  Thus, the trial court needed to decide whether, under Code § 63.2-1205, Hudson was withholding his consent contrary to the children's best interests.  Under Section 1205, the court "shall consider all relevant factors," including the following[9]:

1. The birth parent(s)' efforts to obtain or maintain legal and physical custody of the child;
2. Whether the birth parent(s) are currently willing and able to assume full custody;
3. Whether the birth parent(s)' efforts to assert parental rights were thwarted by others;
4. The birth parent(s)' ability to care for the child;
5. The age of the child;
6. The quality of any previous relationship between the birth parent(s) and the child and between the birth parent(s) and any other minor children;
7. The duration and suitability of the child's present custodial environment; and
8. The effect of a change in physical custody on the child.

"[S]o long as the circuit court properly considered the statutory factors, we can reverse its conclusions only if they are beyond the pale of reasonableness."  *Geouge v. Traylor*, 68 Va. App. 343, 371 (2017).  Moreover, "[b]ecause the circuit court heard evidence ore tenus, its factual

---

[8] Hudson challenges the trial court's determinations under Code §§ 63.2-1202(H) and -1205 in his assignments of error 1, 2, 3, 6, and 10.

[9] Hudson assigned error to the trial court's failure to "properly consider [his] constitutional rights."  To sever the legal relationship between a natural parent and their child without violating the federal Due Process Clause, the trial court must find (1) that the natural parent is unfit, and (2) a continuing parent-child relationship would be detrimental to the child's welfare.  *Copeland v. Todd*, 282 Va. 183, 199 (2011).  In *Copeland*, our Supreme Court determined that the statutory factors in Code § 63.2-1205 encompass those two constitutionally required findings.  *Id.*  Thus, consideration of the statutory factors necessarily included consideration of Hudson's constitutional rights.

findings are 'entitled to the same weight accorded a jury verdict'" and "will not be disturbed on appeal unless plainly wrong or without evidence to support them." *Id.* at 347 (quoting *Bristol Dep't of Soc. Servs. v. Welch*, 64 Va. App. 34, 44 (2014)).

Here, there is sufficient evidence to support the trial court's conclusion that the adoption is in the children's best interests. We consider the evidence before the trial court pertaining to each of the factors below, grouping them where appropriate.

*(1) The birth parent(s)' efforts to obtain or maintain legal and physical custody of the child*; *(2) Whether the birth parent(s) are currently willing and able to assume full custody*; and (7) *The duration and suitability of the child's present custodial environment*. Lynsey currently has sole legal and physical custody of the children. The children live in the Massies' home, along with another child born to the Massies. The Massies financially provide for the children. There is no dispute that the children have a suitable environment. On the other hand, Hudson has not sought legal or physical custody of the children. Since December 2016, Hudson has only visited with the children over a five-month period between August 2018 and December 2018.

While Hudson stated at trial that he was "willing and able to have custody" of the children, his other statements conveyed he was not *currently* willing and able to gain custody. In his testimony, Hudson sought a "transition period of visitation" before gaining custody, and he requested to see the children every other weekend and holidays. After questioning Hudson about space constraints in his household, the guardian ad litem asked Hudson whether "at best, you foresee the only visitation you could have . . . would be potentially every other weekend and only when" two other children in his care were staying with their father. Hudson responded, "And holidays and stuff. I mean, pretty much the agreement that we already had," establishing a schedule of visitation. When asked specifically "[i]s it ever your intention that these children

live with you primarily, as in any point in time during a school week or more than they live with mom," Hudson answered, "No."

*(4) The birth parent(s)' ability to care for the child.* Some evidence in the record, including credible allegations of domestic violence and child abuse, casts doubt on Hudson's ability to care for the children. Although Hudson was acquitted of criminal wrongdoing related to the December 2016 incident, he admitted that Lynsey suffered injuries during two instances of violence between them. Following one of those incidents (in November 2016), Lynsey had to get six staples placed in her head, and there was no evidence that Hudson suffered any injuries. That Hudson was accused of abusive behavior in Tennessee bolstered the credibility of Lynsey's testimony that Hudson instigated violence against her and independently raised doubts regarding Hudson's parental fitness. No matter if Hudson intentionally injured the alleged child abuse victim, there is no dispute in the record that the child was found in his care with significant injuries, prompting a CPS investigation.

Hudson's relationship with his new partner's child was also probative of his ability to care for the children. As detailed above, the child was found in Hudson's care with serious injuries, prompting an investigation by Tennessee CPS. Then, when a no-contact order with the child was issued against him, Hudson elected to remain living in the same home with the child's mother. Although Hudson testified that he stayed in the home because the child's mother did not wish them to live apart, his choice still required the child to leave his mother's home and reside with his father instead. When combined with the fact that the mother—with whom Hudson resided at the time of trial—was also named by CPS in its child abuse investigation and had a child born with substance addiction in 2020, these facts cast doubt on Hudson's ability to care for his children.

The record is also clear that Hudson has never financially supported the children after he and Lynsey separated. While not dispositive, a failure to provide financial support is probative of his lack of ability to care for the children. *See Hickman v. Futty*, 25 Va. App. 420, 433 (1997) (considering Hickman's failure to pay child support in affirming trial court's decision to grant adoption). While Lynsey dismissed her petition for child support when the petition for adoption was filed, such that no formal child support order was ever issued, it is still relevant that Hudson failed to financially support his children. This is particularly true given that Hudson missed a hearing at which child support would have been determined, leading to a capias being issued for his arrest. On the other hand, Lynsey has proved her ability to care for the children by acting as their primary caretaker. Lynsey testified—and there is no dispute in the record—that she can provide financially for the children, and her current partner has a good relationship with the children.

*(6) The quality of any previous relationship between the birth parent(s) and the child and between the birth parent(s) and any other minor children*. As mentioned above, Hudson and Lynsey ended their relationship in December 2016 after an incident of domestic violence that included Lynsey shooting Hudson in the back. The children were present in the home during this incident, as well as during a prior incident in November that ended with significant injuries to Lynsey and required her to get six staples in her head. After December 2016, Hudson did not see the children until he received court-ordered visitation in August 2018. That arrangement lasted until January 2019, when Lynsey stopped allowing him to see the children due to the allegations from CPS in Tennessee. Hudson has had no relationship with the children since then.

As for the relationships between the birth parents and any other minor children, the child of Hudson's new partner was found in his care with significant injuries, prompting a CPS investigation. Hudson was subject to a no-contact order with the child while that investigation

- 11 -

took place. Hudson decided to remain living with his partner at her request, which required the child to move in with the child's father. Even though the CPS investigation was eventually determined to be "unfounded," Hudson's decision to prioritize his partner casts a negative light on his relationship with the child. On the other hand, it is uncontested that Lynsey has a good relationship with both the adoptive children and the child she had with Michael.

*(5) The age of the child.* At the time of trial, the two adoptive children were in elementary and middle school. One of the children has ADHD and is on an Individualized Education Plan. While the age of the children does not weigh for or against Hudson, the children will require many more years of parental oversight before reaching the age of majority.

*(3) Whether the birth parent(s)' efforts to assert parental rights were thwarted by others.* Lynsey thwarted Hudson's efforts to visit with the children, deciding to ignore a court order that required visitation. At the same time, the trial court had the discretion to weigh this alongside other probative facts. For example, the trial court was entitled to consider evidence that Lynsey's refusal to allow visitation was based on a reasonable fear for the children's safety, substantiated by an ongoing CPS investigation. Also relevant here is that after Lynsey said Hudson could not see the children until he proved nothing happened in Tennessee, Hudson did not even ask her to see them again for six months. And he waited nearly a year and a half to ask the court to enforce his visitation rights.

*(8) The effect of a change in physical custody on the child.* Here, the trial court had to consider that Hudson did not actually want physical custody of the children—only visitation— and weigh that against the consistent and supportive living situation the children had been in for several years. Hudson himself testified that he would not want to disrupt the children's current living situation.

In the final adoption order, the trial court stated that it had "considered each of the factors set forth in § 63.2-1205" and found "clear and convincing evidence that Mr. Hudson's withholding of his consent to this adoption is contrary to the best interests of the children and that a continued relationship with the natural father will be detrimental to their welfare." Given the evidence presented relevant to each of the statutory factors, we cannot say this conclusion was an abuse of discretion. Hudson's current unwillingness or inability to assume custody of the children, his lack of a positive past relationship with the children, substantial questions about his ability to care for the children, and the quality of his relationship with the child of his new partner fairly support the trial court's decision to grant the adoption. *See Geouge*, 68 Va. App. at 371 (affirming trial court's decision to grant an adoption where there was evidence of the objecting parent's "repeated violations of the law, substance abuse issues, occasionally violent behavior, and repeated incarcerations"); *Copeland v. Todd*, 282 Va. 183, 188, 201 (2011) (evidence sufficient to support adoption where objecting parent agreed to relinquish temporary custody of the child to the petitioners while she was incarcerated, had an unstable housing and financial situation, never offered child support or sought the return of her child following her release, and had little to no contact with the child for about two years).

Based on this record, the trial court did not err in granting the petition for adoption.

II. The trial court did not commit reversible error in refusing to admit the proffered transcripts from Hudson's criminal trial.

Just before his cross-examination of Lynsey, Hudson sought to admit transcripts from his criminal trial—related to the December 2016 domestic violence incident—for impeachment purposes. The court rejected the evidence, explaining that it would be improper to admit the entire transcripts because much of the content would be irrelevant to Lynsey's credibility. It

noted, however, that there was "no question" Hudson could read from the transcripts to frame his questioning of Lynsey for impeachment purposes.

Hudson then cross-examined Lynsey regarding her testimony at the criminal trial. He asked her whether she made specific statements at trial, including that Hudson was "lining up some powder on the dresser" around the time he assaulted her, that a photo of the scene supported her description of the powder, and that she suffered a bruise on her neck, despite knowing it was a hickey. Lynsey admitted that she testified to the powder on the dresser, but she stated that she did not remember testifying about the photo,[10] and she stated that she never lied about having a bruise.

Hudson laid a sufficient foundation to admit extrinsic evidence of the two statements that Lynsey did not remember or denied making. Kent Sinclair, *The Law of Evidence in Virginia* § 12-3[d] (8th ed. 2022) (explaining that a party may admit extrinsic evidence to impeach by prior inconsistent statement if the witness denies making or remembering the statement but not if the witness admits making the inconsistent statement). Thus, Hudson could have impeached with the transcripts Lynsey's statements that she did not remember testifying about the photo and never lied about having a bruise, but not her admission that she testified to powder on the dresser.[11]

---

[10] Hudson questioned Lynsey about the photo because she allegedly relied on it at the criminal trial to support her account of Hudson's drug use contemporaneous with the alleged attack. Hudson's counsel asked Lynsey on cross if she remembered that this photo contradicted another photo taken earlier in time by the police, suggesting that Lynsey had staged the powder on the dresser.

[11] To the extent Hudson attempted to admit the transcripts to show specific instances of unadjudicated perjury, the rules of evidence prohibit the use of extrinsic evidence for that purpose. Va. R. Evid. 2:608(d).

Rather than impeach Lynsey with the transcripts during cross-examination, however, Hudson waited to proffer them during his case-in-chief. At that time, he proffered that

> the transcript of the criminal trial testimony will establish that Lynsey committed perjury during the criminal trial with respect to her claims that [Hudson] was the aggressor, and that the transcript will show that Lynsey shot Hudson in the back, and that Lynsey had rearranged the crime scene to justify her attack on Hudson and that the Washington County Circuit Court Clerk has a certified digital copy of the trial transcript on file.

The trial court excluded the transcripts, however, because there was no court reporter available to authenticate them. This was error under Code § 8.01-420.3:

> Whenever a party seeks to introduce the transcript or record of the testimony of a witness at an earlier trial, hearing or deposition, it shall not be necessary for the reporter to be present to prove the transcript or record, provided the reporter duly certifies, in writing, the accuracy of the transcript or record.

*See also Waller v. Commonwealth*, 22 Va. App. 53, 60 n.1 (1996) (noting that authentication of a transcript by a witness "is no longer required" under the statute and that a transcript is self-authenticating if certified by a court reporter).

That the trial court erred does not end the inquiry. We must determine whether the error was harmless. *Commonwealth v. Kilpatrick*, 301 Va. 214, 216-17 (2022) ("An appellate court reviews a decision to admit or exclude evidence where no federal constitutional issue was raised under the standard for non-constitutional harmless error provided in Code § 8.01-678." (quoting *Haas v. Commonwealth*, 299 Va. 465, 467 (2021))). Under that standard, we must determine whether there has been "a fair trial on the merits" and whether "substantial justice has been reached." Code § 8.01-678. "In a civil case, the erroneous exclusion of evidence is reversible error when the record fails to show plainly that the excluded evidence could not have affected the verdict." *Barkley v. Wallace*, 267 Va. 369, 374 (2004). "Thus, we consider the potential effect of the excluded evidence in light of all the evidence that was presented [at trial]." *Id.*

- 15 -

The court's error was harmless here because the statements eligible for impeachment by extrinsic evidence were cumulative of the evidence already before the court. *Pace v. Richmond*, 231 Va. 216, 227 (1986) ("Although evidence may be relevant, its exclusion does not constitute reversible error if it is merely cumulative."). Hudson's proffer alleged that the transcripts would undermine Lynsey's credibility by showing she falsely portrayed Hudson as the primary aggressor in the December 2016 domestic violence incident. But when Hudson made this proffer, the record already contained evidence showing that Lynsey's initial account of that incident may have been exaggerated. Although the petition for adoption stated that Hudson was responsible for creating a "volatile and abusive" environment, there was no dispute in the record that Hudson was acquitted of any criminal wrongdoing, and Lynsey admitted that she shot Hudson in the back during the December altercation.

In addition, Lynsey testified to another incident of domestic violence, after which she received six staples in the head. Hudson did not contest that this happened, and agreed that the children were present at the time. This other incident alone would be sufficient evidence from which the trial court could have fairly concluded that Hudson's ability to "care for the child[ren]," Code § 63.2-1205, was compromised.

Therefore—given the other testimony—the relevant portions of the proffered transcripts excluded by the trial court "would not have substantially assisted the [factfinder] in weighing the credibility of [Lynsey] or otherwise to resolve any disputed issue of fact." *May v. Caruso*, 264 Va. 358, 363 (2002).

III. The trial court did not err in allowing the Massies to introduce evidence about events that took place before January 23, 2019.

Hudson also argues that the trial court improperly "re-litigated" the facts and evidence underlying the January 23, 2019 decision of the Washington County Circuit Court to grant

- 16 -

Hudson visitation with the children. Hudson alleges on brief that these facts and evidence, including "evidence to prove neglect or abuse by Hudson" prior to January 23, 2019, were barred from the court's consideration under the law-of-the-case doctrine and res judicata.

Neither doctrine applies because the adoption petition does not involve the same parties from the visitation decision. *Steinman v. Clinchfield Coal Corp.*, 121 Va. 611, 620 (1917) ("The [law-of-the-case] doctrine, briefly stated, is this: Where there have been two appeals in the case, between the same parties, and the facts are the same, nothing decided on the first appeal can be re-examined on a second appeal."); *Lane v. Bayview Loan Servicing, LLC*, 297 Va. 645, 655 (2019) ("Both claim preclusion and issue preclusion require identity of the parties."). Whereas the court's order regarding custody and visitation involved only Lynsey and Hudson, Michael Massie is a party to the adoption proceeding. Michael was not a party, nor in privity with Lynsey, in the prior custody and visitation matter, so neither the law-of-the-case doctrine nor res judicata apply. *See Lee v. Spoden*, 290 Va. 235, 248 (2015) ("The touchstone of privity for purposes of res judicata is that a party's interest is so identical with another that representation by one party is representation of the other's legal right." (quoting *State Water Control Bd. v. Smithfield Foods, Inc.*, 261 Va. 209, 214 (2001))).[12]

IV. Hudson failed to argue below that the trial court demonstrated bias or attempted to discredit the truthfulness of a witness by aggressively questioning him on the stand.

Finally, Hudson argues that the trial judge abused his discretion "by verbally attacking Hudson" during his examination. In support of his argument, Hudson submitted an audio

---

[12] The statutory factors a court must consider to determine "best interests of a child for purposes of determining custody or visitation arrangements," Code § 20-124.3, also differ from the statutory factors a court must consider in determining whether consent to adoption was withheld "contrary to the best interests of the child," Code § 63.2-1205. And in any event, while the order granting Hudson visitation was entered after Hudson allegedly abused his partner's child in Tennessee, no allegations concerning that abuse were presented to the court in connection with the visitation order.

recording of the hearing below.  In the recording, whenever Hudson attempts to answer one of the trial court's questions, the court can be heard aggressively cutting off Hudson's answers to ask further questions.[13]

Generally, "a trial judge's practice of asking questions 'is common and perfectly permissible.'"  *Mall Amusements, LLC v. Va. Dep't of Alcoholic Beverage Control*, 66 Va. App. 605, 615 (2016) (quoting *Mazer v. Commonwealth*, 142 Va. 649, 655 (1925)).  A trial judge "is not to sit there and see a failure of justice on account of omissions to prove facts plainly within the knowledge of a witness, but the character of his questions should not be such as to disclose bias on his part, or discredit the truthfulness of the witness."  *Id.* (quoting *Mazer*, 142 Va. at 655).

Yet in some cases, a judge may express bias that undermines the integrity of the proceeding.  In *Wilson v. Commonwealth*, 272 Va. 19, 30 (2006), for example, our Supreme Court vacated the defendant's conviction even though the evidence was otherwise sufficient, because the trial judge improperly denied counsel's motion to recuse.  There, the judge showed a "personal bias and prejudice" against Wilson's counsel after the attorney tried to avoid having the trial before that judge, and admitted to the judge that he was trying to avoid that courtroom.  After learning that Wilson was set for a bench trial before another judge, the judge managed to have the case re-assigned to him and then refused to allow the Commonwealth and defendant to present a plea agreement that they had negotiated.  *Id.* at 29.

In this case, the trial judge examined Hudson from the bench regarding his alleged failure to pay child support, his failure to appear at child support hearings, and his lack of contact with

_____

[13] Appellees object on brief to the inclusion of the audio recording in the appellate record, but the objection comes too late.  Under Rule 5A:7(b), disagreements regarding the appellate record must "be submitted to and decided by the trial court" in the first instance, and the appellees do not point to any objection they lodged with the trial court.

the children.  Throughout the examination, the court mocked Hudson's prior testimony that he had failed to financially support the children, but "not for the lack of trying."  After saying with a raised voice "so cool: not for the lack of trying," the court asked Hudson to explain how he tried to pay support, "besides a little thing in a little text that says: 'Can I buy something for Joey this Christmas?'"[14]  Rather than allow an answer, the court chastised Hudson for failing to appear at child support hearings, stating "why they're not serving a capias on you today, I do not know.  If this were my Court, I would have notified them to come and serve a capias on you."

When Hudson tried to answer non-verbally, the trial judge shouted: "No, don't shake your head up and down: give me an answer."  Hudson then started explaining why he did not appear at some support hearings, and the court interrupted, shouting, "No.  Why weren't you paying support?"  Hudson then stated, "I guess we hadn't got to it yet," and the court interrupted, "No, wait a minute; no wait a minute.  You hadn't gotten to it yet?  You knew you had to come to court, right?"  Hudson paused before answering, and the court shouted, "Correct?" to which Hudson responded, "Correct, yes, sir."

After that, the court again told Hudson to explain how he "tried to pay support for these two children."  Hudson started to answer, "I had money for Lynsey and the kids—" and the court interrupted, shouting, "No.  It was part of support enforcement.  They issued a capias for your immediate arrest . . . .  Are you telling me that Judge just decided to whip you on the street somewhere?"  Hudson answered "no," and the court shouted, "No.  Tell me how you tried to pay support for these two children through the process . . . .  Could you tell me how you, have you yet to tell me how you tried?"

---

[14] Neither of the children at issue are named Joey.

When Hudson told the court that he had attempted to contact support enforcement, the court responded with a raised voice, "What did you do?  Please tell me.  Because I swear to God if you commit perjury in this courtroom I will have you . . . tell me how you did it."  Hudson stated that he had contacted the "JDR Court downstairs," and the court shouted, "No.  Support enforcement.  They are the ones who are doing this.  You knew that."  The judge then accused Hudson of "playing games" with the legal process and said that he thought Hudson should be in jail on a capias.

Later in the examination, after Hudson stated that he did not know one of the children at issue was on an Individualized Education Plan, the court chastised him again, stating, "You're not even aware that your children have some sort of special need?"  The court also expressed its disbelief that Hudson did not know he could contact the children with help from third parties, including school officials, without Lynsey's permission.  And then the court continued to express disbelief with Hudson for testifying that he had been unable to attend some of his children's extracurricular activities because Lynsey never informed him about them.  The court stated: "That's right, right?  Is that your excuse?  Your excuse for not seeing your child playing little league football, wrestling, whatever it is, it's because you couldn't get the parent to tell you . . . everything that's publicized as to what the schedule is, when they're playing, where they're playing?"

Eventually, the court acknowledged that it had raised its voice at Hudson—stating, "Okay, now I've vented my spleen a little bit"—and ensured that its colloquy with Hudson was in the record.  The court directed the court reporter to "make sure you get that in there," because "[t]he people in the appella[te] court and Supreme Court always make sure I'm looking at you and say make sure it's in there."  The court then began its questioning of Hudson anew, stating, "and I'll start from a very low voice."

- 20 -

Critically, Hudson was represented by counsel and his counsel did not object to the court's questioning. The nature of the questioning could raise potential concerns about the trial court's impartiality here. *See Taylor v. Hayes*, 418 U.S. 488, 501-02 (1974) (noting that a court's "mounting display of an unfavorable personal attitude" toward a defendant could suggest that the judge had become so personally involved in the case that he could no longer be impartial). But while counsel faces a difficult task in notifying a court to the possibility that it can no longer "hold the balance between vindicating the interests of the court and the interests of the" defendant, *id.* at 501 (quoting *Ungar v. Sarafite*, 376 U.S. 575, 588 (1964)), in the absence of an objection we are left with nothing to review on appeal. Rule 5A:18 ("No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice."). Thus, we find this assignment of error was waived.

## CONCLUSION

For these reasons, we affirm the trial court's decision to grant the petition for adoption.

*Affirmed.*